UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT P. KANE,
By and on Behalf of the United States of America,
Relator,

State of New York, *ex rel.*
Robert P. Kane, Relator,

State of New Jersey, *ex rel.*
Robert P. Kane, Relator,

vs.

HEALTHFIRST, INC., *et al.,*

Defendants.

**Civil Action No. 11-2325 (ER)**

ECF CASE

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

vs.

CONTINUUM HEALTH PARTNERS, INC.; BETH
ISRAEL MEDICAL CENTER d/b/a MOUNT SINAI
BETH ISRAEL; and ST. LUKE'S-ROOSEVELT
HOSPITAL CENTER d/b/a MOUNT SINAI ST.
LUKE'S and MOUNT SINAI ROOSEVELT,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE COMPLAINT IN INTERVENTION OF THE UNITED STATES OF AMERICA**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL ALLEGATIONS AND STATUTORY BACKGROUND ................................... 2

    A.    Factual Allegations ............................................................................................. 2

    B.    Statutory Background .......................................................................................... 4

ARGUMENT ...................................................................................................................... 5

  I. THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS HAD AN "OBLIGATION" ................................................................................................... 7

  II. THE COMPLAINT FAILS TO ALLEGE THAT THE DEFENDANTS KNOWINGLY CONCEALED OR KNOWINGLY AND IMPROPERLY AVOIDED OR DECREASED AN OBLIGATION ............................................... 14

  III. THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS HAD AN OBLIGATION TO PAY OR TRANSMIT MONEY TO THE FEDERAL "*GOVERNMENT*" ............................................................................................... 17

CONCLUSION ................................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allison Engine Co. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008)................................................................................19, 20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................................6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................5, 6

*Chapman v. Office of Children & Family Servs. of the State of N.Y.,*
    423 F. App'x 104 (2d Cir. 2011) ....................................................................16

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987).........................................................................................10

*Madonna v. United States,*
    878 F.2d 62 (2d Cir. 1989)................................................................................6

*O'Brien v. Nat'l Prop. Analysts Partners,*
    936 F.2d 674 (2d Cir. 1991)..............................................................................6

*Segal v. Gordon,*
    467 F.2d 602 (2d Cir. 1972)..............................................................................7

*Tanner v. United States,*
    483 U.S. 107 (1987).........................................................................................19

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)...........................................................................................12

*United States ex rel. Corp. Compliance Assocs. v. N.Y. Soc. for the Relief of the Ruptured
    and Crippled, Maintaining the Hosp. for Special Surgery,*
    __ F. Supp. 3d __, No. 07 Civ. 292 PKC,
    2014 WL 3905742 (S.D.N.Y. Aug. 7, 2014)..............................................6-7, 16

*United States ex rel. Pilecki-Simko v. Chubb Inst.,*
    443 F. App'x 754 (3d Cir. 2011) .....................................................................16

*United States ex rel. Polansky v. Pfizer, Inc.,*
    No. 04-CV-0704 (ERK), 2009 WL 1456582 (E.D.N.Y. May 22, 2009) ............6, 7

*United States ex rel. Taylor v. Gabelli,*
    345 F. Supp. 2d 313 (S.D.N.Y. 2004)................................................................6

*United States ex rel. Totten v. Bombardier Corp.*,
    286 F.3d 542 (D.C. Cir. 2002) ............................................................................20

*United States ex rel. Wood v. Applied Research Assocs., Inc.*,
    328 F. App'x 744 (2d Cir. 2009) ........................................................................6

*United States ex rel. Yannacopoulos v. Gen. Dynamics*,
    636 F. Supp. 2d 739 (N.D. Ill. 2009),
    *aff'd*, 652 F.3d 818 (7th Cir. 2011) ...........................................................7, 8

*United States v. Caremark, Inc.*,
    634 F.3d 808 (5th Cir. 2011) ..............................................................................21

*United States v. Raymond & Whitcomb Co.*,
    53 F. Supp. 2d 436 (S.D.N.Y. 1999) ................................................................7

**STATUTES**

18 U.S.C. § 371 ...........................................................................................................19

31 U.S.C. § 3729 .........................................................................................................17

31 U.S.C. 3729(a)(1)(G) ................................................................................... passim

31 U.S.C. §§ 3729-3733 ...............................................................................................1

31 U.S.C. § 3729(a)(1) ..........................................................................................10, 15

31 U.S.C. § 3729(a)(1)(A)-(D) ...................................................................................20

31 U.S.C. § 3729(a)(2) ................................................................................................19

31 U.S.C. § 3729(a)(7) (2008) ......................................................................................5

31 U.S.C. § 3729(b)(1) .................................................................................................9

31 U.S.C. § 3729(b)(2) ................................................................................................20

31 U.S.C. § 3729(b)(2)(B) ..........................................................................................18

31 U.S.C. § 3729(b)(3) ...........................................................................................5, 8

31 U.S.C. § 3730(b)(2) ................................................................................................10

31 U.S.C. § 3730(c)(3) ................................................................................................10

31 U.S.C. § 3730(d)(1) and (2) ...................................................................................10

31 U.S.C. § 3730(b)(1) and (2) ...................................................................................18

31 U.S.C. § 3730(c)(2)(A) and (B) ........................................................................18

31 U.S.C. § 3732(b) ............................................................................................18

31 U.S.C. § 3732(c) ............................................................................................18

31 U.S.C. § 3733(l)(8) .........................................................................................19

42 U.S.C. § 1320a-7k(d) ................................................................................ passim

42 U.S.C. § 1320a-7k(d)(4)(B) .......................................................................20, 21

42 U.S.C. § 1395nn ........................................................................................11, 12

Fraud Enforcement and Recovery Act of 2009 ("FERA") .................................. passim

Patient Protection and Affordable Care Act (the "Affordable Care Act"), Pub. L. No.
    111-148, § 10104(j)(2), 124 Stat. 119, 901-02 (2010) ......................................5

Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-25 .............................................5, 8

Pub. L. No. 111-148, § 6402(a) ...................................................................5, 8, 10

Pub. L. No. 111-148, § 6409 ................................................................................12

**OTHER AUTHORITIES**

42 C.F.R. § 411.350 *et seq*...................................................................................11

Black's Law Dictionary 156 (9th ed. 2009)...........................................................15

Black's Law Dictionary 327-28 (9th ed. 2009) .....................................................14

H.R. 3200, 111th Cong. § 1641 (as introduced by the House, July 14, 2009) .................9

H.R. 3590, 111th Cong. ................................................................................10, 12

H.R. 3962, 111th Cong. § 1641 (as introduced by the House, Oct. 29, 2009) ..............12

Fed. R. Civ. P. Rule 8(a)..............................................................................5, 6, 16

Fed. R. Civ. P. Rule 9(b)..........................................................................1, 6, 7, 16

Fed. R. Civ. P. Rule 12(b)(6) ...............................................................................1, 5

New York State Office of Medicaid Inspector General, *Self-Disclosure Submission
    Checklist (Rev. 7/14) available at*
    http://www.omig.ny.gov/images/stories/self_disclosure/self_disclosure-
    blue_sheet_july2014.pdf (last visited September 21, 2014)................................11

S. Rep. 111-10 (Mar. 23, 2009) ..................................................................................17

S. Rep. 99-345 (1986).................................................................................................5

Webster's II New Riverside University Dictionary 354 (1984) ....................................15

## PRELIMINARY STATEMENT

The Government's Complaint in Intervention (the "Complaint") should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim and pursuant to Rule 9(b) because the conclusory allegations are plainly not sufficient as a matter of law.  The claims asserted against Continuum Health Partners, Inc. ("Continuum"), Beth Israel Medical Center ("Beth Israel"), and St. Luke's Roosevelt Hospital Center ("St. Luke's") (collectively "Defendants") under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, that they knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, are not supported by plausible allegations that are sufficiently particularized to satisfy the stringent requirements of Federal Rule of Civil Procedure 9(b) and/or fail to allege facts to establish the elements of the claims.

The Complaint relies heavily (if not exclusively) on an email communication from Relator Robert Kane ("Kane") to a group of his colleagues dated February 4, 2011 (Exhibit B to the Complaint) to support the Government's contention that Defendants' failure to make unspecified repayments quickly enough thereafter constituted a violation of the FCA.  However, as the Complaint itself acknowledges, Kane's email did not specifically identify any overpayments.  Instead, it attached a preliminary list identifying the universe of claims that were potentially affected by a bill coding error caused by a third party, without indicating whether those claims were billed to or paid by the Government.  A separate schedule, annexed to the Complaint as Exhibit A, shows that approximately half of the claims on Kane's email list were not billed or paid.

Under 42 U.S.C. § 1320a-7k(d), mere notice of a potential overpayment does not give rise to an "established duty" until 60 days after the overpayment is "identified" (*i.e.*, when the

health care provider has actual knowledge of the overpayment).   Because the list did not "identify" any overpayments, it did not give rise to any "established duty," and thus did not create an "obligation" that is a prerequisite for liability.

Additionally, even if the Kane email was sufficient to create an "obligation", the Complaint fails to plausibly allege that Defendants knowingly concealed an obligation or knowingly and improperly avoided or decreased an obligation since an obligation cannot be concealed, avoided or decreased through inaction.   Moreover, given the preliminary nature of Kane's email list, and his own characterization of the list as preliminary, the Complaint fails to create a plausible inference that any alleged concealing, avoiding or decreasing of an obligation was done "knowingly."   Nor do the allegations suffice to create a plausible inference that Defendants' conduct was "improper."

Finally, the Complaint should also be dismissed because any "obligation" that arose was owed to New York's Medicaid program, not to the United States.   Because only "obligations" to the United States are actionable under the provision of the FCA at issue here, there is no actionable claim asserted.

## FACTUAL ALLEGATIONS AND STATUTORY BACKGROUND

### A.    Factual Allegations

The Complaint alleges that the Defendants were informed by the New York State Comptroller in September 2010 that a "small number of claims" had been erroneously submitted to Medicaid for reimbursement.  (Cmplt. ¶ 6.)  The errors on these claims were not caused by Defendants.  Rather, an insurer sent Defendants miscoded claims information, and the miscoding caused Continuum's electronic billing system to generate bills automatically to secondary payors, including Medicaid.  (Cmplt. ¶ 31.)

2

Soon after receiving notice of the insurer's erroneous coding, Continuum management asked Kane, then a Continuum employee, to identify the claims affected by the "software error." (Cmplt. ¶ 34.)   In early February 2011, Kane circulated an email that indicated that "approximately 900 specific claims totaling over $1 million *may have been* wrongly submitted to and paid by Medicaid as a secondary payor." (Cmplt. ¶ 7) (emphasis added).   As the email stated, Kane's summary did not indicate whether claims were actually billed to or paid by Medicaid. (Cmplt. ¶ 35.)   Instead, he merely identified the universe of claims "containing the billing code that caused the billing problem." (*Id.*)   According to the Complaint, Kane's email also emphasized that "further analysis was needed to corroborate his findings." (Cmplt. ¶ 35.) Indeed, Kane himself characterized his summary as giving only "some insight to the magnitude of the issue." (Cmplt. Exhibit B at 1.)   Moreover, as the schedule annexed to the Complaint showing the subsequent history of all of the claims that were miscoded by the insurer shows, approximately half of the claims on Kane's email list were never billed or paid. (Cmplt. Exhibit A.)

Continuum terminated Kane on February 8, 2011. (Cmplt. ¶ 36).   There is no allegation in the Complaint that Kane's termination had anything to do with his role in responding to the overpayment issue.   Nor is there any allegation that Kane was discouraged from identifying affected claims.   To the contrary, as noted above, Continuum's management tasked Kane with the responsibility of fixing the problem and pressed him for a resolution. (Cmplt. Exhibit B at 1.)   Indeed, almost two weeks before Kane sent his summary, Continuum's Vice President for Patient Financial Services sent him an email asking when she could expect a report identifying the affected accounts. (*Id.*)

After Kane's termination, Continuum allegedly failed to follow up on Kane's email and claims summary, and "failed to take the necessary steps to timely identify the claims affected by the software issue or to timely reimburse DOH for those affected claims that resulted in overbilling to Medicaid." (Cmplt. ¶¶ 8, 39).[1]   Although all of the erroneous payments were eventually returned (Cmplt. ¶ 38), the Government alleges that the delay in returning the erroneous payment was "intentional or reckless." (Cmplt. ¶ 39.)

### B.   Statutory Background

The United States alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(G), which provides, in pertinent part, that a person violates the statute if he or she "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See id.*[2]   Violations of this subsection of the FCA are commonly referred to as "reverse false claims" because, unlike typical FCA violations involving excessive or improper claims for payment, violations of this subsection involve efforts to retain money or property owed to the United States.

"Reverse false claims" were first made actionable under the FCA in 1986 in response to decisions holding that the FCA's provisions prohibiting the presentation of false claims for payment and the making or use of false records or statements to get a claim paid did not reach

---

[1] The Government further alleges that a large number of erroneous payments were not refunded until "in or after" June 2012 which, according to the Complaint, is the same month that the United States "issued" a Civil Investigate Demand ("CID"). (Cmplt. ¶ 38.)  A spreadsheet attached to the Complaint listing the date that all of the erroneous payments were refunded, however, shows that nearly every overpayment was refunded by the end of June 2012, and many were refunded early in the month.  The Government fails to specify the actual date that the CID was "issued," let alone the date that it was served or received.

[2] The United States does not allege a violation of the first clause of 31 U.S.C. § 3729(a)(1)(G) which makes it a violation of the FCA to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government[.]"  *See* September 3, 2014 Letter from Jean-David Barnea to Court (Dkt. No. 46) at n. 1.

4

"reverse false claims." *See* S. Rep. 99-345 (1986). As originally enacted, the "reverse false claim" subsection of the FCA provided that a person violated the statute if he or she "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(7) (2008).

The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-25, recodified and replaced the former 31 U.S.C. § 3729(a)(7) with § 3729(a)(1)(G). FERA also added a definition of "obligation" to the FCA. In pertinent part, an "obligation" is defined as "an established duty, whether or not fixed . . . arising from the retention of any overpayment." *See* Pub. L. No. 111-21, § 4 (codified at 31 U.S.C. § 3729(b)(3)).

Less than a year after FERA was enacted, Congress passed the Patient Protection and Affordable Care Act (the "Affordable Care Act"), Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02 (2010). As relevant to this motion, the Affordable Care Act created a new requirement for health care providers to report and return "identified" overpayments within 60 days of the date they are "identified." *Id.* at § 6402(a) (codified at 42 U.S.C. § 1320a-7k(d)). The statute further provides that an overpayment that is not returned within 60 days of the date it is "identified" is an "obligation" for the purposes of the FCA. *Id.* As shown below, the allegations of the Complaint are not sufficient to establish any of these potential statutory violations.

## ARGUMENT

A plaintiff's obligation under Rule 8(a) to provide the grounds of his or her entitlement to relief "requires more than labels and conclusions[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss under Rule 12(b)(6) should be granted if the plaintiff has not

5

pled "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Because "general accusations of fraud are thought to be too amorphous to provide a defendant with sufficient notice to permit a response," fraud claims are subject not only to the standards set forth in Fed. R. Civ. P. 8(a), but also "to the heightened pleading standard of Rule 9(b)[.]" *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004). This "heightened" pleading standard is "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing', [] to protect a defendant against the institution of a strike suit," *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991), and to "discourage the filing of complaints as a pretext for discovery of unknown wrongs," *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).

Because "[i]t is self-evident that the FCA is an anti-fraud statute," claims "brought under the FCA fall within the express scope of Rule 9(b)." *United States ex rel. Wood v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009), quoting *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995). To satisfy Rule 9(b), a plaintiff must "1) specify the statements that the plaintiff contends were fraudulent; 2) identify the speaker; 3) state where and when the statements were made; and 4) explain why the statements were fraudulent." *United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)); *see also United States ex rel. Corp. Compliance Assocs. v. N.Y. Soc. for the Relief of the Ruptured*

*and Crippled, Maintaining the Hosp. for Special Surgery*, __ F. Supp. 3d __, No. 07 Civ. 292 PKC, 2014 WL 3905742, at *11 (S.D.N.Y. Aug. 7, 2014) ("to satisfy Rule 9(b), an FCA claim must allege the particulars of the false claims themselves, and [] allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity.")   "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *Polansky*, 2009 WL 1456582, at *4 (internal quotation marks omitted).   Pleadings of fraud cannot be based on conclusory allegations or speculation.   *See, e.g.*, *Segal v. Gordon*, 467 F.2d 602, 606-08 (2d Cir. 1972).

## I.
## THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS HAD AN "OBLIGATION"

The statutory language plainly requires that a defendant must have an obligation to pay or transmit money to the U.S. Government to incur liability under 31 U.S.C. § 3729(a)(1)(G). Before the 2009 amendment of the FCA under FERA, the FCA did not define the term "obligation."   However, the Ninth, Tenth, and Eleventh Circuits all held that only a present, existing duty, as opposed to a potential future liability, was actionable under the pre-2009 version of the FCA.   *See United States ex rel. Yannacopoulos v. Gen. Dynamics*, 636 F. Supp. 2d 739, 751-52 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th Cir. 2011) (citing *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008); *see also United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 445-46 (S.D.N.Y. 1999).   As *Yannacopoulos* explains:

> To recover under the False Claims Act, ... the United States must demonstrate that it was owed a specific, legal obligation *at the time that the alleged false record or statement was made, used, or caused to be made or used.* The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have a *present duty* to pay money or property that was created by a statute, regulation, contract,   judgment,   or   acknowledgment   of   the

> indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed .... The deliberate use of the certain, indicative, past tense suggests that Congress intended the reverse false claims provision to apply only to *existing* legal duties to pay or deliver property.

*Yannacopoulos,* 636 F. Supp. 2d at 750-51 (quoting *Bourseau,* 531 F.3d at 1169) (emphasis added). Applying this standard, *Yannacopoulos* held that "simple retention of an overpayment [made by the Government under a federal contract] until the final contract price could be determined would not . . . create a present obligation to refund the money" absent a specific provision in the contract that created a present duty to return the money. *Id.* at 756.

As noted above, FERA added a definition of the term "obligation" to the FCA. *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-25 (codified at 31 U.S.C. 3729(b)(3)). Pursuant to that definition, an obligation is, *inter alia,* "an established duty, whether or not fixed . . . arising from the retention of an overpayment." *Id.* This definition, through the use of the phrase "established duty," codifies the requirement established under case law that only a present, existing duty can impose an "obligation". *See Yannacopoulos,* 636 F. Supp. 2d at 752 n.4.

The Government alleges that the provision of the Affordable Care Act (Pub. L. No. 111-148, § 6402(a), codified at 42 U.S.C. § 1320a-7k(d)) requiring the reporting and return of overpayments within 60 days of the date an overpayment is "identified," creates the "established duty" needed to give rise to an "obligation". (Cmplt. ¶ 27). The statute also provides that an overpayment that is retained after the deadline for reporting and returning is an "obligation" under the FCA. *Id.*

The Complaint alleges that Defendants' failure to return amounts listed in the February 4, 2011 email summary of claims within 60 days of Kane's email distribution created an

"obligation" within the meaning of the FCA.  (Cmplt. ¶¶ 27-8)  However, Kane's summary (as described in the Complaint and in its own words) did not give rise to an "obligation" because it did not "identify" any overpayments, as required to trigger the 60-day clock for reporting and returning overpayments under 42 U.S.C. § 1320a-7k(d).  (*See* Cmplt. ¶ 7) (stating that the Kane email identified claims that "*may have been* wrongly submitted to and paid by Medicaid[.]") (emphasis added).

Both the statutory scheme and the legislative history of 42 U.S.C. § 1320a-7k(d) demonstrate that a preliminary report like Kane's that only identifies <u>potential</u> overpayments (as opposed to actual confirmed overpayments) does not start the 60-day clock to establish an "obligation" under the statute.  Specifically, Congress deliberately elected to substitute the word "identify" for "known" overpayment to protect providers from being subject to FCA liability when the potential overpayments have not yet been confirmed and/or quantified.  The initial health reform bill introduced by the House of Representatives in 2009 included a provision requiring the reporting and return of "known" overpayments within 60 days of the date the person "knows" of the overpayment.  *See* H.R. 3200, 111th Cong. § 1641 (as introduced by the House, July 14, 2009).  The bill also provided that a "known" overpayment retained past the deadline for reporting and returning is an obligation under the FCA.  *Id.*  Finally, the bill provided that the term "knows has the same meaning as the terms 'knowing' and 'knowingly' under the FCA."  *Id.*  The FCA knowledge standard includes recklessness and deliberate ignorance.  *See* 31 U.S.C. § 3729(b)(1).  Thus, the House bill would have imposed liability for recklessly failing to uncover or remaining deliberately ignorant of an overpayment.

Congress chose not to adopt the overpayment provision initially proposed by the House. Instead, it enacted the Senate bill that included a much more limited provision requiring health

9

care providers to report and return only "identified" (as opposed to "known") overpayments. *See* Public L. 111-148 § 6402(a) enacting H.R. 3590, 111th Cong. Thus, interpreting 42 U.S.C. § 1320a-7k(d) to create an obligation to refund based on the mere notice of a potential overpayment would contravene the principle of statutory construction that "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (internal quotation marks omitted).

The policy rationale for Congress' decision to subject only a failure to report and return <u>identified</u> overpayments to liability under the FCA is clear. Congress sought to strike an appropriate balance in requiring the prompt return of overpayments, without imposing unrealistic burdens on providers that would result in crippling and improper liability. Specifically, the FCA provides for treble damages and penalties of $11,000 per violation. *See* 31 U.S.C. § 3729(a)(1). In addition, the FCA is subject to enforcement by whistleblowers who are entitled to up to 30% of the recovery, *see* 31 U.S.C. § 3730(d)(1) and (2), and are free to pursue actions even where the Government declines to do so. *See* 31 U.S.C. § 3730(c)(3). Congress appreciated that the 60-day timeframe for returning overpayments is extremely short and virtually impossible to satisfy unless an overpayment has been confirmed and quantified.[3]

A review of the steps most health care providers would take after receiving notice of <u>potential</u> overpayments illustrates why requiring the reporting and return of overpayments within 60 days of such notice imposes an enormous burden on providers that may often be impossible to meet. Faced with an internal audit that suggests that some percentage of sampled claims for

---

[3] Indeed, the FCA provides that whistleblower complaints must remain under seal for at least 60 days after filing to provide the Government with time to investigate and determine whether it will intervene. *See* 31 U.S.C. § 3730(b)(2). However, as in this case, 60 days is often inadequate, and the Government seeks extensions of the seal.

certain procedures have been improperly coded, a provider would likely review the findings by retrieving and reviewing the medical records involved, discussing the cases with the physicians who furnished the services, and consulting with staff with expertise in coding and, possibly, counsel. If the review confirms the audit determination, there may be a need to extend the audit to review claims outside of the audit sample or to do more sampling from different time periods or different physicians. The design of that further review will require factual investigation and legal analysis concerning a number of questions including the time period to be covered by the audit, the services to be included in the audit, and the providers to be included in the audit. Assuming that the audit identified overpayments, the provider's reimbursement staff will then have to make arrangements to return the overpayments. Doing so may require the identification of every specific claim that has been overpaid by claim number, additional governmental identifiers, date of service, patient, and amount billed and paid. *See, e.g.*, New York State Office of Medicaid Inspector General, *Self-Disclosure Submission Checklist* (Rev. 7/14) *available at* http://www.omig.ny.gov/images/stories/self_disclosure/self_disclosure-blue_sheet_july2014.pdf (last visited September 21, 2014). A similar process is required when a hospital receives notice that certain of its physician arrangements may violate the complex statute and regulations governing "physician self-referral". *See* 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq.*[4]

---

[4] The legislative history of another provision in the Affordable Care Act directing the Secretary of the Department of Health and Human Services ("HHS") to create a self-disclosure protocol ("SRDP") for "actual or potential" violations of the Physician-Self-Referral Law (42 U.S.C. § 1395nn) demonstrates that Congress was concerned about the impracticability of reporting and returning "known" overpayments within 60 days in some circumstances. Specifically, an initial version of the provision on the SRDP would have tolled the 60-day clock for reporting and returning overpayments that were self-disclosed under the SRDP. *See* H.R. 3962, 111th Cong. § 1641 (as introduced by the House, Oct. 29, 2009). The ostensible reason for the tolling provision was that the Physician-Self-Referral Law is highly complex, and it often takes more than 60 days to determine whether a violation occurred and the amount of any liability. After the language of the overpayment provision in the Affordable Care Act was

In sum, Congress had a sound policy rationale for not subjecting health care providers to liability under the FCA for failing to report and return overpayment within 60 days of the receipt of notice of an unconfirmed and unquantified potential overpayment.

Basic principles of statutory construction also dictate that an overpayment is not "identified" by mere notice of a potential but unconfirmed overpayment. Specifically, failing to repay an obligation quickly enough violates the FCA only where the obligation is "knowingly" concealed or "knowingly and improperly" avoided or decreased. Thus, "knowledge" of the overpayment is clearly a prerequisite to liability. Accordingly, interpreting "identified" as being synonymous with "known" would render the term "identified" superfluous when used in the statute which contravenes the canon of statutory construction that statutes should not be interpreted in a manner that would render any word superfluous. *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The Complaint does not allege that Kane's email summary "identified" any overpayments as required to create an obligation under 42 U.S.C. § 1320a-7k(d). Instead, the Complaint alleges only that it identified claims that "contain[ed] the Healthfirst billing code that caused the billing problem." (Cmplt. ¶ 35.) Many of the claims that contained this billing code, however, were not billed or paid, and thus did not result in overpayments. Specifically, Kane's summary, which is attached to the Complaint, lists over 900 claims with over $1.5 million in

---

changed to refer to "identified" instead of "known" overpayments, however, the tolling provision was eliminated. *See* Public L. 111-148, § 6409 enacting H.R. 3590, 111th Cong. (codified at 42 U.S.C. § 1395nn). The elimination of the tolling provision reflects Congress' understanding that by starting the 60-day clock for reporting and returning overpayments only upon "identification" of the overpayment, it eliminated the need for tolling by allowing health care providers to determine whether they violated the Physician-Self-Referral Law and the amount owed in connection with that violation before the 60-day clock begins to run.

potential overpayments. (Cmplt. ¶ 7 and Exhibit B.)[5]  As it turns out, only 465 of the 900 claims were paid, for a total payment of $871,000. (*See* Cmplt. Exhibit A.)   Kane's summary did not indicate which of the 900 "affected claims" were paid, and if so in what amount. (*See id.*)  It thus failed to identify any overpayments.

The Government admits that Kane's summary did not actually identify overpayments. For example, during the pre-motion hearing, the United States stated that Kane's list required "someone to go through each one of the items on the list and identify that more than half of those items actually involved an overpayment." *See* Transcript of Sept. 5, 2014 Pre-Motion Conference at p. 23, lines 13-15.[6]  Similarly, the Complaint characterizes Kane's email summary as merely identifying the universe of claims that "may have been wrongly submitted to Medicaid[.]" (Cmplt. ¶ 7) (emphasis added).

Kane himself made it clear that his list did not identify overpayments.   As the Government euphemistically describes it, "Kane's email indicated that further analysis was needed to corroborate his findings." (Cmplt. ¶ 35.)  In truth, Kane characterized his list as a "report on the CAS CO 2 Segments that were problematic from HF."  In other words, Kane described his list of claims that may have resulted in overpayments, not as a list of actual overpayments.  He further noted that the list did not "show[] the effect the posting had on Eagle"[,] the billing software used by the Defendants,  and noted that a further report from the

---

[5] Kane's summary lists approximately $794,000 in affected claims for Beth Israel, $666,000 for St. Luke's, and $144,000 for LICH.

[6] Counsel for Relator similarly described Kane's list as identifying only the "subset of all potential claims affected by [the] billing error", and suggested that it would have taken additional work and time to review the claims on Kane's list and to identify the claims that actually resulted in overpayments. *Id.* at p. 15, lines 11-16.

13

"Remit Database" was required to identify any overpayments. (Cmplt. Ex. B.) In sum, according to Kane, his report provided only "some insight to the magnitude of the issue." (*Id.*)

Because Kane's email and summary did not "identify" any overpayments, the facts alleged do not establish any "obligation" Defendants had under the FCA. Thus, the Government fails to state a claim under the FCA as a matter of law.[7]

## II.
## THE COMPLAINT FAILS TO ALLEGE THAT THE DEFENDANTS KNOWINGLY CONCEALED OR KNOWINGLY AND IMPROPERLY AVOIDED OR DECREASED AN OBLIGATION

The Complaint also fails to state a claim because none of the allegations would support a reasonable inference that the Defendants knowingly "concealed" an "obligation" or knowingly and improperly "avoided" or "decreased" an "obligation," even assuming some obligation existed.

The word "conceal" is not defined in the FCA. However, Black's Law Dictionary defines a "concealment" as "*an act* by which one prevents or hinders the discovery of something; a cover-up." Black's Law Dictionary 327-28 (9th ed. 2009) (emphasis added).[8] This definition requires that the alleged wrongdoer take some affirmative action to "conceal." Something cannot be suppressed or kept from disclosure through inaction. However, the Complaint does not allege any affirmative acts taken by Defendants to prevent any purported overpayment from being disclosed. Instead, the Complaint alleges only that Defendants "failed to take the necessary steps to timely identify the claims affected by the software issue . . . ." (Cmplt. ¶ 39.)

---

[7] The spreadsheet with the subsequent history of claims (Exhibit A) also shows that Kane's February 4, 2011 spreadsheet omitted $21,000 in overpayments, and 12 claims with payments of approximately $37,000 were repaid within 60 days of the date that Kane circulated his email. The Complaint fails to state a claim regarding a violation of the FCA with respect to these claims.

[8] Black's Law Dictionary does not define "conceal."

The term "avoid" is also undefined but, again, according to Black's Law Dictionary, the definition of "avoidance" includes the "*act* of evading or escaping." Black's Law Dictionary 156 (9th ed. 2009) (emphasis added). As a legal term, "avoid" means to annul or cancel. *Id.* Thus, to knowingly avoid an obligation, the individual must take active and conscious action. Here, the Complaint merely alleges that the Defendants failed to act quickly enough to identify overpayments. (Cmplt. ¶ 39.) It does not allege that Defendants took any action to "avoid" making repayment, which, in due course, it did in full.

The Complaint is similarly devoid of allegations that Defendants knowingly "decreased" an obligation. Decrease is commonly defined as "to grow or cause to grow gradually smaller or less[.]" *See* Webster's II New Riverside University Dictionary 354 (1984).[9] Decreasing an obligation would thus necessarily involve affirmative conduct. For example, an obligation might be decreased through an improper accounting practice. As noted above, however, the Complaint does not include any specific allegations of affirmative efforts to reduce any amount owed to Medicaid. Instead, the Complaint alleges only that Defendants failed to act quickly enough. (Cmplt. ¶ 39.)

The damages provision of the FCA confirms that an alleged failure to act is not sufficient to state a claim under 31 U.S.C. § 3729(a)(1)(G). It provides that damages are calculated based on the amount of damages sustained "because of *the act* of [the person violating the statute]". *See* 31 U.S.C. § 3729(a)(1) (emphasis added). Had Congress intended for a person to be liable under the FCA for a failure to act quickly enough, it stands to reason that it would have changed its damages provision either under FERA or under the Affordable Care Act to encompass such failures to act.

---

[9] Black's Law Dictionary does not define "decrease."

Even if an obligation could be concealed, avoided or decreased through a failure to act quickly enough, the Complaint still fails to state a claim or plead fraud with particularity because the allegations that Defendants acted knowingly are deficient.  To survive a motion to dismiss, a complaint alleging a violation of the FCA must assert facts supporting a reasonable inference that the defendant acted knowingly.  *See Chapman v. Office of Children & Family Servs. of the State of N.Y.*, 423 F. App'x 104 (2d Cir. 2011) (FCA complaint failed to state a claim for relief because there was no plausible allegation of scienter); *see also United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 761 (3d Cir. 2011) (FCA complaint failed to state a plausible claim for relief as required by Rule 8(a) because it did not include "facts supporting a reasonable inference" that defendant acted knowingly).  The Complaint alleges conduct that is, at most, merely consistent with knowingly concealing, avoiding or decreasing an obligation. Specifically, Kane's email stated that a separate report from the "Remit Database" was required to identify overpayments, and characterized the summary as providing nothing more than "some insight into the magnitude of the issue."  (Cmplt. Exhibit B.)   In light of his statements concerning the report and the preliminary nature of his work, the alleged failure to respond quickly enough after Kane's report identified potential overpayments is hardly indicative of a knowing effort to conceal, avoid, or decrease an obligation.  Rather, it is just as likely that Defendants accepted Kane's characterization of the report as preliminary and incomplete, and were waiting for the new report that he indicated was required.  Allegations like these that are merely consistent with liability fail to satisfy Rule 9(b) and fail to "'nudge [a claim] across the line from conceivable to plausible.'"  *See Corp. Compliance Assocs.*, 2014 WL 3905742, at *17 (quoting *Twombly*, 550 U.S. at 570.)

16

Finally, the Complaint fails to allege that Defendants *improperly* avoided or decreased an obligation. There is nothing "improper" about possessing an overpayment that is returned within the time allotted under applicable law. Indeed, the legislative history of 31 U.S.C. § 3729 confirms that Congress did not intend for the retention of an overpayment to give rise to liability when retention is consistent with a statutory or regulatory scheme. *See* S. Rep. 111-10, at *15 (Mar. 23, 2009). The Senate Judiciary Report on FERA states:

> there are various statutory and regulatory schemes in Federal contracting that allow for the reconciliation of cost reports that may permit an unknowing, unintentional retention of an overpayment. The Committee does not intend this language to create liability for a simple retention of an overpayment that is permitted by a statutory or regulatory process for reconciliation, provided the receipt of the overpayment is not based upon any willful act of a recipient to increase the payments from the Government when the recipient is not entitled to such Government money or property.

*Id.* 42 U.S.C. § 1320a-7k(d) gives health care providers 60 days from the date an overpayment is "identified" to return an overpayment. The requirement that avoiding or decreasing an obligation must be "improper" thus precludes liability for overpayments that are returned within 60 days of their identification as contemplated by 42 U.S.C. § 1320a-7k(d).

In short, Kane's February 4, 2011 email summary did not "identify" any overpayments, and the United States has not alleged with particularity that overpayments were identified at any other time and then not returned within 60 days. The United States has thus failed to allege with the requisite particularity that the Defendants "improperly" avoided or decreased an obligation.

### III.
### THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS HAD AN OBLIGATION TO PAY OR TRANSMIT MONEY TO THE FEDERAL *"GOVERNMENT"*

To state a claim for relief under the provision of 31 U.S.C. § 3729(a)(1)(G) at issue here, a plaintiff must allege that the defendant had an obligation to pay or transmit money or property to the *federal* Government.

The text of the FCA makes clear in several ways that the "obligation to pay or transmit money or property to the Government" that is a prerequisite to liability under 31 U.S.C. § 3729(a)(1)(G) is an obligation to the *federal* Government, not to a state government.  First, there are several instances in the FCA where the reference to the "Government" can mean only the federal Government.  For example, 31 U.S.C. § 3729(b)(2)(B) excludes from the definition of "claim" "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment."  Also, 31 U.S.C. §§ 3730(b)(1) and (2), which govern *qui tam* actions brought by whistleblowers on behalf of the federal Government, state that such actions shall be brought in the name of the "Government" and that the "Government" may elect to intervene.  And 31 U.S.C. § 3730(c)(2)(A) and (B) grant the "Government" the power to dismiss or settle *qui tam* actions.  Since states do not pay compensation for federal employment and cannot intervene in, dismiss, or settle federal FCA cases, these references to "Government" can only be to the federal Government.[10]

Moreover, the text of the FCA frequently distinguishes between the federal "Government" (with a capital 'G') and "state and local governments" (with a lower case 'g').  For example, 31 U.S.C. § 3732(b) grants federal subject matter jurisdiction to claims brought under state law "for the recovery of funds paid by a state or local government."  Similarly, 31 U.S.C. § 3732(c) provides that, to the extent "any State or local government" is named as a co-

---

[10] The State of New York has intervened in this action pursuant to the provision of the New York State False Claims Act, not the federal FCA.  (*See* Complaint in Intervention of the State of New York ¶ 11.)

plaintiff in an action, a seal under the *qui tam* provisions of the FCA will not preclude the "Government" from serving the complaint on state or local law enforcement. 31 U.S.C. § 3733(l)(8), which governs Civil Investigative Demands, refers to communications between the United States Department of Justice and "a Federal, State, or local government agency." If the term "Government" were meant to include state Medicaid programs, the statute would have referred to communications between the Department of Justice and "a Government agency."

Supreme Court precedent confirms that an obligation to a state Medicaid program is not an actionable "obligation to pay or transmit money or property to the *Government*." *See* 31 U.S.C. 3729(a)(1)(G) (emphasis added). In *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), the Supreme Court addressed the issue of whether a claim made by a subcontractor to a prime contractor (the latter of which was the direct recipient of federal funds) constituted a "claim" to the "Government" under former 31 U.S.C. § 3729(a)(2). The United States argued that because the allegedly false claim was ultimately paid out of federal funds, it made no difference that the claim was made to and paid by a prime contractor instead of the Government itself. *Allison Engine*, 553 U.S. at 669. The Court, however, unanimously refused to rewrite the FCA to substitute "paid by Government funds" for the statute's actual text, "paid or approved by the Government." *Id.* at 673.

*Allison Engine* also considered whether the FCA's conspiracy provision encompassed a scheme that had the effect of causing a prime contractor to make payments using federal funds. In holding that it did not, *Allison Engine* relied heavily on *Tanner v. United States*, 483 U.S. 107, 109 (1987), where the Supreme Court held that a conspiracy to defraud a federally funded entity was not a conspiracy to defraud "the United States" within the meaning of 18 U.S.C. § 371. *Allison Engine* explained:

> In *Tanner*, the Government argued that a recipient of
> federal financial assistance and the subject of federal
> supervision may itself be treated as 'the United States.' We
> rejected this reading of § 371 as having not even an
> arguable basis in the plain language of § 371.  Indeed, we
> concluded that such an interpretation would have, in effect,
> substituted '*anyone receiving federal financial assistance
> and supervision*' for the phrase '*the United States.*'

*Allison Engine*, 553 U.S. at 673 (internal citations and quotation marks omitted) (emphasis

added); *see also United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 544 (D.C. Cir.

2002) (holding that a defendant could not be held liable for submitting false claims to Amtrak in

violation of the FCA).

Congress reacted to *Allison Engine* by deleting references to the "Government" from the

direct false claims provisions of the FCA (31 U.S.C. §§ 3729(a)(1)(A)-(D)) and amending the

definition of "claim" to include a request for "money or property and whether or not the United

States has title to the money or property that (ii) is made to a contractor, grantee, or other

recipient, if the money or property is to be spent or used on the Government's behalf or to

advance a Government program or interest . . . ."  *See* 31 U.S.C. § 3729(b)(2).  By contrast,

Congress made no corresponding amendment to the reverse false claim provision of FCA at

issue here.  Thus, while *Allison Engine* no longer limits liability for so-called direct false claims

under 31 U.S.C. § 3729(a)(1)(A)-(D), its rationale continues to preclude liability under the

second clause of the FCA's reverse false claim provision (31 U.S.C. § 3729(a)(1)(G)) for

obligations to state Medicaid programs.

While 42 U.S.C. § 1320a-7k(d)(4)(B) defines the term overpayment to include Medicaid

funds to which a person is not entitled, that provision does not modify the language of the

reverse false claim provision of the FCA at issue in this case.  On its face, the provision of the

FCA at issue here only applies to an obligation to the federal Government.  *See* 31 U.S.C. §

3729(a)(1)(G).   Giving effect to the plain language of § 3729(a)(1)(G) does not render the language in 42 U.S.C. § 1320a-7k(d)(4)(B) relating to Medicaid payments superfluous. Specifically, the first clause of § 3729(a)(1)(G) makes it a violation of the FCA to "knowingly make[], use[] or cause[] to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government". The "cause to be made or used" and "material to an obligation" language render this clause broader than the second clause of § 3729(a)(1)(G).   For example, making a false record or statement concerning an overpayment from a state Medicaid program could *cause* the Medicaid agency to use a false record or statement related to the federal Government's obligation to the Medicaid agency. *See, e.g.*, *United States v. Caremark, Inc.*, 634 F.3d 808, 815-16 (5th Cir. 2011).   The inclusion of Medicaid payments in the definition of overpayment could thus be given effect in an action under the first clause of § 3729(a)(1)(G). The United States, however, does not assert a cause of action under the first clause of § 3729(a)(1)(G). *See* September 3, 2014 Letter from Jean-David Barnea to Court (Dkt. No. 46) at n. 1.

In sum, the Complaint fails to allege that Defendants had an obligation to the federal Government.  It thus does not state a claim for which relief can be granted.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

Dated: New York, New York            Respectfully submitted,
       September 22, 2014

                                  PROSKAUER ROSE LLP


                      By:   s/ Bettina B. Plevan
                                Bettina B. Plevan
                                Edward S. Kornreich
                                Roger A. Cohen
                                Harris M. Mufson
                                PROSKAUER ROSE LLP
                                Eleven Times Square
                                New York, NY 10036-8299
                                (212) 969-3000

                                *Counsel for Defendants Continuum Health Partners,*
                                *Inc., Beth Israel Medical Center, and St. Luke's*
                                *Roosevelt Hospital Center*