**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT P. KANE,<br>By and on Behalf of the United States of<br>America, Relator,<br><br>State of New York, *ex rel.*<br>Robert P. Kane, Relator,<br><br>State of New Jersey, *ex rel.*<br>Robert P. Kane, Relator,<br><br>        v.<br><br>HEALTHFIRST, INC., et al.,<br><br>        Defendant. | 11 CIV. 2325 (ER) |
| UNITED STATES OF AMERICA,<br><br>        Plaintiff-Intervenor,<br><br>        v.<br><br>CONTINUUM HEALTH PARTNERS,<br>INC., et al.,<br><br>        Defendants. | |

**THE UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for United States of America
86 Chambers Street, 3rd Floor
New York, New York 10007

REBECCA C. MARTIN
JEAN-DAVID BARNEA
JACOB M. BERGMAN
Assistant United States Attorneys
     -Of Counsel-

# TABLE OF CONTENTS

Page:

Preliminary Statement....................................................................................................2

Background ...................................................................................................................6

Argument ......................................................................................................................8

    I.      Applicable Legal Standard......................................................................8

    II.    The Complaint Properly Alleges That Defendants Violated the
          Reverse False Claims Provision of the False Claims Act..........................................8

          A.  The Reverse False Claims Provision and the 2009 FERA Amendment.............8

          B.  The 2010 Affordable Care Act Overpayment and 60-Day Rule Provisions .......12

          C.  The Government has Alleged That Defendants Knowingly and Improperly
              Avoided an Obligation to Repay Money to the Government .............................14

    III.   Defendants' Proposed Interpretation of Section 3729(a)(1)(G) Should be
           Rejected...................................................................................................17

          A.  Defendants' Construction of "Identified" in the Affordable Care Act Would
             Render the Second Clause of 31 U.S.C. § 3729(a)(1)(G) Meaningless .............17

          B.  The Government Has Alleged That Defendants Knowingly and Improperly
             "Avoided" an Obligation to Pay Money to the Government .............................19

    IV.   Avoiding an Obligation to Pay Money to Medicaid Gives Rise to Liability
          Under the False Claims Act ...................................................................20

    V.    If the Court Determines the Complaint is Inadequately Plead,
          The Government Requests Leave to Amend ...........................................25

Conclusion ..................................................................................................25

# TABLE OF AUTHORITIES

**CASES** Page:

*Allison Engine Co. v. U.S. ex rel. Sanders*,
553 U.S. 662 (2008)............................................................... passim

*American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ....................................................10

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986)........................................................25

*Mikes v. Straus*,
274 F.3d 687 (2d. Cir. 2001)....................................................20

*U.S. ex rel. Totten v. Bombardier Corp*,
380 F.3d 488 (D.C. Cir. 2004)..............................................22, 23

*U.S. ex rel. Yannacopoulos v. General Dynamics*,
636 F. Supp. 2d 739 (N.D. Ill. 2009) ........................................12

*U.S. v. Bourseau*,
531 F.3d 1159 (9th Cir. 2008) ..................................................17

*U.S. v. Raymond & Whitcomb Co.*,
53 F. Supp. 2d 436 (S.D.N.Y. 1999)........................................17

*United States ex rel. Atkins v. McInteer*,
345 F. Supp. 2d 1302 (N.D. Ala. 2004),...................................22

*United States ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006) ................................................11

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
142 F.3d 296 (6th Cir.1998) .....................................................17

*United States ex rel. Feldman v. City of New York*,
808 F. Supp. 2d 641 (S.D.N.Y 2011)........................................20

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .....................................................8

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
   614 F.3d 1163 (10th Cir. 2010) ........................................................8

*United States ex rel. Longest v. Dyncorp*,
   2006 WL 47791 (M.D. Fla. Jan. 9, 2006).......................................8

*United States v. Brown*,
   333 U.S. 18 (1948)...........................................................................19

*United States v. Dauray*,
   215 F.3d 257 (2d Cir. 2000)............................................................20

*United States v. Huron Consulting Group, Inc.*,
   *2011 WL 253259 (S.D.N.Y. Jan. 24, 2011)*...................................8

*United States v. Krizek*,
   111 F.3d 934 (D.C. Cir. 1997) .......................................................17

*United States v. Lakeshore Medical Clinic, Ltd.*,
   2013 WL 1307013 (E.D. Wis. Mar. 28, 2013) ...................... passim

*United States. v. Neifert-White Co.*,
   390 U.S. 228 (1968)........................................................................19

*United States v. Q International Courier, Inc.*,
   131 F.3d 770 (8th Cir. 1997) ...................................................10, 12

*Wexner v. First Manhattan Co.*,
   902 F.2d 169 (2d Cir.1990)..............................................................8

**STATUTES**

31 U.S.C. § 3729(a)(1)(G) .......................................................... passim

31 U.S.C. § 3729(a)(1)....................................................................9, 22, 23

31 U.S.C. § 3729(a)(2)...........................................................21, 22, 23, 24

31 U.S.C. § 3729(a)(7) (2000) ............................................................9, 10, 11

31 U.S.C. § 3729(b)(1)(A) .......................................................................12

31 U.S.C. § 3729(b)(1)(B) .......................................................................12

31 U.S.C. § 3729(c) (2000) ......................................................................23

42 U.S.C. § 1320a-7k(d)(1) .................................................................12

42 U.S.C. § 1320a-7k(d)(4)(B) ....................................................5, 13, 21

42 U.S.C.  § 1320a-7k(d)(2) .............................................................3, 13

42 U.S.C. § 1320a-7k(d)(3) ...............................................................13

42 U.S.C.  § 1320a-7k(d) ....................................................................13

42 C.F.R. § 422.326 .....................................................................5, 13

42 C.F.R. § 423.360 .....................................................................5, 13

42 C.F.R. § 422.326(c) .......................................................................14

42 C.F.R. § 423.360(c) .......................................................................14

42 U.S.C. § 1320(d)-7k .....................................................................18

2009 U.S.C.C.A.N. 438 ...........................................................22, 23, 24

Fraud Enforcement and Recovery Act, Pub. Law 111-21, 123 Stat. 1617 (2009) ..............9

79 Fed. Reg. 29,844 (May 23, 2014) ............................................................13

79 Fed. Reg. 29,924 (May 23, 2014) ......................................................14, 18

The United States of America, through its attorney, Preet Bharara, the United States

Attorney for the Southern District of New York, respectfully submits this memorandum of law in

opposition to the motion ("Mot.") of Defendants Continuum Health Partners, Inc.

("Continuum"), Beth Israel Medical Center d/b/a Mount Sinai Beth Israel ("Beth Israel"), and St.

Luke's-Roosevelt Hospital Center d/b/a Mount Sinai St. Luke's and Mount Sinai Roosevelt's

("St. Luke's Roosevelt") (collectively, "Continuum" or "defendants") to dismiss the Complaint-

In-Intervention of the United States of America ("Complaint").

## PRELIMINARY STATEMENT

Defendants violated 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act ("FCA") when

they improperly delayed returning Medicaid overpayments for more than two years after the

overpayments were first identified.  In September 2010, the New York Office of the State

Comptroller (the "Comptroller") notified Continuum that Medicaid had been wrongly billed as a

secondary payor for a small number of claims.  Continuum then became aware that the extent of

the overbilling was far greater than the small number of claims specified by the Comptroller (i)

when it learned that the cause of the overbilling was a software glitch and (ii) when, in February

2011, Relator, Robert Kane ("relator" or "Kane") provided Continuum with a spreadsheet

identifying hundreds of claims that were affected by the glitch.  Four days after receiving this

spreadsheet, however, Continuum fired the relator and did nothing further with his analysis.  In

contrast, the Comptroller continued to analyze Continuum's billing over the course of the next

year and, from March 2011 through February 2012, brought additional tranches of claims to

Continuum's attention for reimbursement.  Continuum then took over two years until March

2013, to fully reimburse the Medicaid program for the overpayments in question.  In short,

Continuum acted in knowing and reckless disregard of its obligation to return the overpayments

2

made by the Medicaid program and thus is liable under the False Claims Act's "reverse" false claims provision, 31 U.S.C. § 3729(a)(1)(G).

Nonetheless, Defendants argue that the Complaint — which gives hundreds of specific examples of the overpayments that Continuum failed to repay to the Medicaid program in a timely fashion and attaches documentary evidence that Continuum's management was aware of the overpayments — should be dismissed for failing to plead fraud with particularity. Defendants contend, in essence, that because they chose not to confirm relator's findings, they had not "identified" the overpayments within the meaning of section 6402 of the Patient Protection and Affordable Care Act, Pub. Law 111-148 (the "Affordable Care Act" or "ACA"), codified at 42 U.S.C. § 1320a-7k(d)(2). Thus, defendants argue, they had no "obligation" to return any overpayments and therefore could not have violated the False Claims Act.

This argument flies defies the meaning of "obligation" set forth in the FCA and, further, undermines the clear intent of Congress when it amended the FCA's reverse false claims provision in 2009. After a succession of court decisions that had unduly narrowed the meaning of "obligation" to include only those that were fully defined and fixed, rendering the reverse false claims provision toothless, Congress amended the FCA to correct these decisions and clarify that the FCA reached "obligations" arising "from the retention of an overpayment" regardless of whether the obligation was fixed or contingent in nature. The conduct at issue fits within the four corners of the reverse false claims provision: defendants retained an overpayment and did so "knowingly," *i.e.,* in reckless disregard of their duty to return the funds. The Court need look no further to find a violation of the reverse false claims provision of the FCA.

The plain text of the 2009 amendment is a sufficient basis to find that the Government has alleged a violation of the FCA's reverse false claims provision. In addition, the Affordable

Care Act and its interplay with the FCA provide an additional basis for the Court to find that the Government has alleged a violation of the reverse false claims provision.  In 2010, Congress enacted the ACA which, among other things, set forth requirements regarding the reporting and return of Medicare and Medicaid overpayments to the Department of Health and Human Services ("HHS") or the State, as appropriate (the "report and return" requirements).  In that context, the ACA defined "overpayment" and, additionally, established a bright line rule that an overpayment must be returned to HHS or the State within 60 days after the overpayment was "identified" and that any overpayment retained after 60 days would be deemed to be an "obligation" for FCA purposes.  While this provision provided a bright line for healthcare providers for when overpayments must be returned and when FCA liability could be triggered, the ACA did not purport to narrow the reverse false claims provision of the FCA, which has wide application to all types of overpayments, *i.e.,* not simply Medicare and Medicaid funds "knowingly" retained.  Accordingly, the Court need not find a violation of the ACA to find a violation of the reverse false claims provision of the FCA.

Separately, however, the ACA *also* captures the conduct at issue.  The Complaint properly and sufficiently alleges that defendants violated the FCA because they failed to return within 60 days the overpayments were identified in relator's February 2011 spreadsheet, which listed claims that were affected by the software glitch and further contained virtually all the claims at issue in this case.

Continuum ignores the plain text of the § 3729(a)(1)(G) and suggests that its operation is coextensive with the ACA's report and return requirements.  It is not.  Under either analysis, however, Continuum cannot avoid liability by asserting that the overpayments were not "identified" within the meaning of the ACA because it chose to halt its investigation into its

4

receipt of overpayments.  The FCA clearly extends to defendants who stick their heads in the same and recklessly disregard information of potential overpayments.

Indeed, HHS's Centers for Medicare and Medicaid (CMS") recently finalized regulations concerning the meaning of "identify" for purposes of returning overpayments received by Medicare managed care providers.  *See* 42 C.F.R. §§ 422.326, 423.360.  Those regulations, while not directly applicable here, confirm that recipients of federal funds have a duty to act with "reasonable diligence."  This means that an entity "has *identified* an overpayment" when it "has determined, or should have determined through the exercise of reasonable diligence, that [it] has received an overpayment" to "identify," and that failure to exercise reasonable diligence can result in FCA liability.  *See id.* (emphasis added).  The claims at issue constituted over half the claims included in a single listing, yet defendants failed to bother to confirm which of these claims resulted in overpayments.  The claims were certainly identified and, at a minimum, defendants failed to act with reasonable diligence in completing a final quantification of the amounts owed.

Defendants also argue that 31 U.S.C. §3729(a)(1)(G) does not reach Medicaid overpayments because the Medicaid program is administered state-by-state rather than directly by the federal government.  Defendants assert that § 3729(a)(1)(G), unlike the rest of the FCA, is constrained by the reasoning of *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008), which Congress almost immediately overruled in 2009.  The FCA has always reached Medicaid claims, and any doubt that *Allison Engine* may have created was removed by the 2009 FERA amendments to the FCA.  Indeed, in defining "overpayment" in the ACA Congress specifically included overpayments to the Medicaid program.  *See* 42 U.S.C. § 1320a-7k(d)(4)(B).  Accordingly, the motion to dismiss should be denied.

5

## BACKGROUND

As described in the Complaint, the Defendants violated the False Claims Act when, for over two years, they knowingly avoided repaying the Government for overpayments received from Medicaid.  Specifically, from early 2009 through late 2010, Beth Israel, St. Luke's Roosevelt and Long Island College Hospital (together, the "Hospitals") submitted claims to Medicaid to which they were not entitled.  *See* Compl. at ¶ 5.  These improper claims, and resulting overpayments, were a result of a software error that caused the Hospitals to seek reimbursement from Medicaid for services that were rendered to Medicaid beneficiaries who were enrolled in a Medicaid managed care insurance program administered by Healthfirst ("Healthfirst beneficiaries").  *Id*. at ¶¶ 31-32.

As described in the Complaint, medical providers who rendered care to Healthfirst beneficiaries were entitled to bill Healthfirst for reimbursement for its services and were entitled to receive the amount Healthfirst would pay pursuant to its contract.  *See id. at* ¶¶  22-24.  As relevant here, providers, such as defendants, were not entitled to bill Medicaid directly for amounts above what Healthfirst paid.  *See id.*  In the course of responding to the reimbursement requests of defendants, Healthfirst would issue remittance advices ("RAs") that detailed what Healthfirst would pay and, among other things, whether the provider should bill any other payor, including, for instance, Medicaid.  *See id. at* ¶ 30.  As a result of an error in the software used by Healthfirst, however, these RAs contained an erroneous code that indicated that the provider should bill Medicaid for the amount of the claim not paid by Healthfirst.  *See id. at* ¶ 31.  As a result, many providers, including defendants, erroneously billed Medicaid, and Medicaid, in turn, paid the claims.  *See id. at* ¶¶ 31-32.  However, Continuum, despite becoming aware of the error and despite having generated a list of approximately 900 claims that had been affected by this

error – approximately half of which resulted in a Medicaid overpayment – failed to return most of these overpayments for up to two years.  *See id. at* ¶¶  33-38.

More specifically, in September 2010, the New York State Comptroller's Office (the "Comptroller") notified Continuum that the Hospitals had erroneously submitted claims for Medicaid reimbursement to the New York State Department of Health for a small number of claims.  *Id*. at ¶ 32.  Soon thereafter, Continuum's management learned of the software glitch and asked the relator to determine which Medicaid claims had been affected by the software error, and within a few months he accomplished this task.  *See id.* at ¶¶ 34-35.

On February 4, 2011, relator sent an e-mail to Continuum's management attaching a spreadsheet that identified more than 900 Medicaid claims, totaling over $1 million, that were impacted by the software error.  *See id*. at ¶ 35 Ex. B.  Mr. Kane noted that he still needed to corroborate his findings; however, he had successfully identified the vast majority of the claims that had been erroneously billed.  *See id*.

Continuum terminated relator's employment four days later and did nothing further with his analysis.  *See id*. at ¶ 36.  Over the next year, the Comptroller continued to inspect Continuum's billing and notified Continuum of several additional tranches of affected claims, repeatedly contacting Continuum to communicate its findings.  *See id.* ¶ 37.  Following the Comptroller's inquiries, Continuum reimbursed DOH for claims improperly billed to Medicaid in more than thirty tranches beginning in April 2011 and concluding in March 2013, including 300 claims that Continuum only returned after the Government issued a Civil Investigative Demand ("CID") seeking information relating to these overpayments.  *See id*. at ¶ 38.  Despite numerous communications with the Comptroller about these overpayments, defendants never disclosed the relator's information and took up to two years to repay the claims.  *Id.*

<u>ARGUMENT</u>

## I.   APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 9(b) provides that, "in alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."  Courts have

recognized that "Rule 9(b)'s ultimate meaning is context-specific . . . .  Depending on the claim,

a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or

mistake' without including all the details of any single court-articulated standard — it depends

on the elements of the claim at hand."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180,

188 (5th Cir. 2009) (internal citations omitted).  Thus, "claims under the FCA need only show

the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that

false claims were submitted as part of that scheme." *United States v. Huron Consulting Group,*

*Inc.*, No. 09 Civ. 1800, 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011) (citing *Kanneganti*, 565 F.3d

at 189).  *See also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) (requirements

of Rule 9(b) may be relaxed when a plaintiff is not in a position to know specific facts until after

discovery and the opposing party has particular knowledge of the facts); *United States ex rel.*

*Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010); *see generally United*

*States ex rel. Longest v. Dyncorp*, No. 03-816, 2006 WL 47791, at *2 (M.D. Fla. Jan. 9, 2006)

(Rule 9(b)'s requirements "may not . . . abrogate the concept of notice pleading.").

## II.   THE COMPLAINT PROPERLY ALLEGES THAT DEFENDANTS VIOLATED THE REVERSE FALSE CLAIMS PROVISION OF THE FALSE CLAIMS ACT

### A.  The Reverse False Claims Provision and the 2009 FERA Amendment

Prior to 2009, the False Claims Act provided that a person who "knowingly makes, uses,

or causes to be made or used, a false record or statement to conceal, avoid, or decrease an

obligation to pay or transmit money or property to the Government" was liable to the United

States for civil penalties and treble damages.  31 U.S.C. § 3729(a)(7) (2000).  This provision,

referred to as the "reverse false claims" provision, was amended in 2009, when Congress passed

the Fraud Enforcement and Recovery Act, Pub. Law 111-21, 123 Stat. 1617 (2009) ("FERA").

FERA extensively amended the FCA, and amended the reverse false claims provision to create

liability for a person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement <u>material to</u> an obligation to pay or transmit money or property to the Government, <u>or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government</u>.

31 U.S.C. § 3729(a)(1)(G) (emphasis added to indicate new language included in the FERA-

amended provision).

Thus, under the second clause of the amended reverse false claim provision, a party that

"knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

transmit money or property to the Government" is liable to the United States for a civil penalty

between $5,500 and $11,000 and treble damages.  *See id.* § 3729(a)(1).

Significantly, FERA also amended the FCA by including a definition of "obligation," as

"an established duty, *whether or not fixed*, arising from an express or implied contractual,

grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from

statute or regulation, *or from the retention of any overpayment*."  Pub. L. No. 111-21, § 4(a)(2),

123 Stat. at 1623 (codified at 31 U.S.C. § 3729(b)(3)) (emphasis added)).  Prior to 2009,

"obligation" had not been defined in the FCA, and in adding this definition, Congress noted that

"[t]he new definition of 'obligation' includes an express statement that an obligation under the

FCA includes 'the retention of an overpayment.' The Department of Justice supported the

inclusion of this provision and provided technical advice that the proper place to include

9

overpayments was in the definition of obligation." S. Rep. No 111-10, at 15 (2009), *reprinted at* 2009 U.S.C.C.A.N. 430, 441.

The definition of "obligation" was also was added by FERA in order to correct, among other cases, the Sixth Circuit's decision in *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999), which narrowly defined "obligation" to include only obligations that were established and fixed in all particulars.  S. Rep. No. 111-10, at 14, fn.10, *reprinted in* 2009 U.S.C.C.A.N. 430, 441.  That decision had concluded that "a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at the time the defendant owed to the Government *an obligation sufficiently certain to give rise to an action of debt at common law*" and did not encompass "[c]ontingent obligations."  *The Limited*, 190 F.3d at 736 (emphasis added).  *See also* S. Rep. No. 111-10, at 14, *reprinted in* 2009 U.S.C.C.A.N. 430, 441 (citing with disapproval *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997), which held that for there to be FCA liability, the obligation "must be for a fixed sum that is immediately due").

Congress corrected the narrow definition of "obligation" set forth in *The Limited* and *Q Int'l Courier* and specifically noted that FERA

> addresses [the] current confusion among courts that have developed conflicting definitions of the term "obligation" in Section 3729(a)(7). The term "obligation" is now defined under new Section 3729(b)(3) and *includes fixed and contingent duties* owed to the government-including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods. It is also noteworthy to restate that while the new definition of "obligation" expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current section 3729(a)(7) [ ]speaks of an "obligation," not a "fixed obligation." By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that "results in a duty to pay the Government money, whether

or not the amount owed is yet fixed."

S. Rep. No. 111–10, at 14 (citations omitted).  The Senate Report approvingly cited *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006), for its construction of "obligation."  *See* S. Rep. 111-10 at 14, fn. 14.  *Bahrani* held that "obligation" in the pre-FERA reverse false claim provision encompassed "instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined."  *Bahrani*, 465 F.3d at 1201.  In that case, the relator alleged that the defendant had falsified documents to avoid paying certain fees to the U.S. Department of Agriculture for the issuance of replacement export certificates, but evidence in the record indicated that the agency sometimes exercised its discretion not to require a replacement certificate or to waive additional fees. The Tenth Circuit concluded that the absence of a fixed monetary obligation by the defendant to pay additional fees to the Government did not preclude a reverse false claim action. Further, despite evidence that the agency had the discretion not to require replacement certificates or additional fees in all instances, the *Bahrani* court held:

> [W]e are not convinced that this alleged discretion takes the obligation to pay the fees outside the scope of § 3729(a)(7). Some discretion inheres in a wide variety of government decisions. For example, government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of § 3729(a)(7).

*Bahrani*, 465 F.3d at 1204.  "We therefore agree with the government that 'the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action.'" *Id.* (quoting the United States' Brief as amicus curiae).

Accordingly, the Senate Judiciary Committee noted, a "reverse" false claim violation is committed "once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment," S. Rep. 111-10, at 15, and "that an 'obligation'" exists

"'whether or not the amount owed is yet fixed.'"  *Id.* at 14 (quoting Brief for United States at 24, *United States v. Bourseau*, No. 06-56741 (9th Cir. July 14, 2008)), reprinted in 2009 U.S.C.C.A.N. 430, 441).  Thus, in 2009, Congress substantially altered the reverse false claims landscape, by imposing liability where a party recklessly disregarded its obligation to refund an overpayment.[1]

Finally, FERA did not substantively amend the terms "knowing" or "knowingly," which the FCA defines to mean when a person, with respect to information, either has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information.  *See* 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required.  *Id.* § 3729(b)(1)(B).

### B.  The 2010 Affordable Care Act Overpayment and 60-Day Rule Provisions

As part of the 2010 Affordable Care Act, Congress enacted a provision requiring recipients of Medicare and Medicaid funds who have "received an overpayment" to "report and return the overpayments" to HHS or the State, as appropriate.  *See* 42 U.S.C. § 1320a-7k(d)(1).  In that context, Congress also adopted the following definition of overpayment: "any funds that a person receives or retains under [the Medicare or Medicaid programs] to which the person, after

---

[1] Defendants attempt to distort the import of the FERA amendment to 3729(a)(1)(G), arguing that Congress "codifie[d] the requirement established under case law that only a present, existing duty can impose an 'obligation.'" Mot. at 8.  Defendants rely on *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 636 F. Supp. 2d 739 (N.D. Ill. 2009), *aff'd,* 652 F.3d 818 (7th Cir. 2011), and in particular rely on *Yannacopoulos'* statement that the "obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have a present duty to pay money."  Mot at 8 (quoting *Yannacopoulos,* 636 F. Supp. 2d at 75-51).  Congress, however, expressly rejected this conceptualization of "obligation."  *See* S. Rep. No. 111-10, at 14 ("the new definition of "obligation" expressly includes contingent, non-fixed obligations").  Indeed, as *Yannacopoulos*  noted, its understanding of the contours of "obligation" was also followed by *Q Int'l Courier,* 131 F.3d 770, which Congress singled out as having an incorrectly narrow construction of the scope of "obligation."  *See* S. Rep. at 14.  Accordingly, defendants are incorrect to suggest that Congress incorporated the restrictive view of "obligation" set forth in *Yannacopoulos.*

applicable reconciliation, is not entitled." *See id.* § 1320a-7k(d)(4)(B).  The Affordable Care Act

additionally sets a deadline for the return of overpayments and provides that an "overpayment

must be reported and returned" within "60 days after the date on which the overpayment was

identified."  *Id.* § 1320a-7k(d)(2).  Further, the ACA in a provision entitled "Enforcement,"

provides that "[a]ny overpayment retained by a person after the deadline for reporting and

returning the overpayment . . . is an obligation (as defined in section 3729(b)(3) of [the False

Claims Act]) for purposes of section 3729 of such title."[2]  *Id.*  § 1320a-7k(d)(3).  Accordingly,

pursuant to the ACA, a person who has "received an overpayment" must report and return such

overpayment within "60 days after the date on which the overpayment was identified" and if the

recipient fails to do so, that recipient has violated the False Claims Act.  *Id.* § 1320a-7k(d).

On May 23, 2014, CMS issued its final rule to implement the reporting and return of

overpayments provisions of the ACA with respect to the Part C Medicare Advantage (*i.e.,*

Medicare managed care) program and the Part D Prescription Drug program.  *See* U.S. Dep't of

Health & Human Servs., Ctrs. for Medicare & Medicaid Servs*., Medicare Program; Contract

Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare

Prescription Drug Benefit Programs,*79 Fed. Reg. 29,844 (May 23, 2014) (the "CMS Rule

Announcement").  In its final rule, CMS adopted the definition of "overpayment" in the ACA

and generally required that Medicare Advantage ("MA") organizations and Part D plan sponsors

to return "identified overpayments" within 60 days.  *See* 42 C.F.R. §§ 422.326, 423.360.  CMS

defined "[i]dentified overpayment" to mean that the MA organization or Part D sponsor "has

identified an overpayment when the [entity] has determined, or should have determined through

---

[2] The ACA provides an alternative reporting deadline as "the date any corresponding cost report
is due, if any."  *Id.* §  1320a-7k(d)(3).  Such deadline, however, has no application in the instant
case.

the exercise of reasonable diligence, that [it] has received an overpayment."  *Id.* §§ 422.326(c),

423.360(c).  CMS explained that "reasonable diligence might require an investigation conducted

in good faith and in a timely manner by qualified individuals in response to credible information

of a potential overpayment."  79 Fed. Reg. at 29,923-24.  CMS specifically rejected commenters'

suggestions that "identify" be defined to require "actual knowledge," observing that

> If the requirement to report and return overpayments applied only to situations where the
> MA organization or Part D sponsor has actual knowledge of the existence of an
> overpayment, then these entities could easily avoid returning improperly received
> payments and the purpose of the section would be defeated. Thus, we decline to read a
> narrow actual knowledge limitation into the law as suggested by commenters. [3]

*Id.* at 29924.  CMS has thus indicated that providers cannot seek to avoid their obligation to

return overpayments by, as Continuum argues, simply deciding not to investigate.  If this were

so, entities could easily avoid returning improperly received payments and the purpose of the

ACA report and return requirements, and the 2009 amendment to the reverse false claim

provision, would be defeated.

### C.  The Government Has Alleged That Defendants Knowingly and Improperly Avoided an Obligation to Repay Money to the Government

The Government has clearly alleged a violation of the 2009 amended version of the

reverse false claims provision, both with and without reference to the ACA 60-day rule.  The

Complaint alleges Continuum learned that it had received such overpayments, became aware of

the scope of these overpayments and nonetheless failed to take remotely reasonable steps to

---

[3] White the claims at issue in this case are Medicaid (and thus are not governed by these rules),
the overarching policy objectives articulated by CMS are not limited to the Medicare managed
care or Part D prescription drug programs, but instead relate to CMS's construction of the term
"identify," which has broad application to Medicare and Medicaid providers.  *See* 79 Fed. Reg.
at 29,924.  These objectives are, thus, broadly applicable and make clear that provider cannot
bury its head in the sand to avoid repayment obligations.  *See id.*

return those funds to Medicaid.  In short, Continuum knowingly avoided its obligation to return those funds to Medicaid for approximately two years.

The facts easily state a claim under the reverse false claims provision.  In *United States v. Lakeshore Medical Clinic, Ltd.*, No. 11-CV-00892, 2013 WL 1307013 (E.D. Wis. Mar. 28, 2013), the court found that the relator had stated a claim under § 3729(a)(1)(G), where defendant had in the course of an audit found high rates of improper "upcoding" by physicians, but failed to follow up on non-audited claims submitted by those doctors, and further, stopped auditing the physicians altogether. *Id.* at *3.  The Court held that "[a]lthough [relator] does not allege that defendant knew that specific requests for reimbursement for [the] services were false, she claims that defendant ignored audits disclosing a high rate of upcoding and ultimately eliminated audits altogether."  *See id.*  The Court held that this allegation:

> states a plausible claim for relief under the amended reverse false claim provision of the FCA for overpayments withheld after May 20, 2009. If the government overpaid defendant for E/M services and defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government.

*Id.* at *4

Here, defendants were notified by the Comptroller's Office in September 2010 that they had submitted claims to Medicaid that led to overpayments.  Compl. at ¶ 33.  Defendants subsequently learned that the source of the overpayments was a software issue and tasked Relator with identifying all claims that had been affected by the software issue.  *Id.* at ¶¶ 33-34. Relator did as he was asked and on February 4, 2011, he e-mailed Continuum's management a spreadsheet identifying over 900 claims from Defendants that were affected by the software issue.  *Id.* at ¶ 35.  While relator recommended further analysis to corroborate his findings, he had, in his February 4, 2011 e-mail, identified almost all of the overpayments received by

15

Continuum as a result of the software problem.  *See id.* Armed with this information, Continuum terminated the relator and ignored his findings.  *See id*. at ¶ 36.

Between February 2011 and March of 2013, Continuum made small repayments over time as the Comptroller repeatedly and over the course of a year, brought additional, individual claims to its attention.  *See id.* at ¶ 37.  Despite having relator's email, which listed virtually all of the overpayments at issue, Continuum reimbursed Medicaid in small tranches beginning in April 2011 and concluding only in March 2013, fraudulently delaying its repayments for up to two years despite its awareness of the extent of the overpayments.  *See id.* at ¶ 38.  Indeed, Continuum reimbursed DOH for over 300 affected claims only in or after June 2012, when the Government issued a CID to Continuum seeking information relating to these payments.  *See id.* Continuum never brought relator's analysis to the attention of the Comptroller despite many communications with the Comptroller concerning additional claims to be repaid.  *See id.*  This is precisely the conduct that Congress intended to capture when it amended the FCA in 2009.  *See* S. Rep. No. 111-10, at 15 (the reverse false claims provision is violated "once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment."). In short, Continuum, at a minimum, "knowingly and improperly avoid[ed]  . . . an obligation to pay or transmit money . . . to the Government."   31 U.S.C. §  3729(a)(1)(G).  *See Lakeshore*, 2013 WL 1307013, at *4 ("Relator … states a plausible claim for relief under [§ 3729(a)(1)(G)]. If the government overpaid defendant for [certain] services and defendant intentionally refused to investigate the possibility that it was overpaid [by Medicaid], it may have unlawfully avoided an obligation to pay money to the government.").

Nevertheless, Defendants contend that the Complaint fails to allege that they acted knowingly within the meaning of the False Claims Act.  Mot. at 16.  This argument, like all of

16

defendants other arguments, rests on the theory that because they took no action after receiving

Relator's e-mail, they were still ignorant of the overpayments and, accordingly, could not have

acted "knowingly."  *See id.*  Defendants go so far as to contend that they lacked knowledge of

the overpayments because it is "likely that Defendants accepted [relator's] characterization of the

report as preliminary and incomplete, and were waiting for the new report that he indicated was

required."  *Id.*  Putting aside the fact that defendants fired Relator four days after he submitted

his report, they cannot sidestep having acted "knowingly" by ignoring clear evidence of

overpayments.  *See, e.g., U.S. v. Raymond & Whitcomb Co.,* 53 F. Supp. 2d 436 (S.D.N.Y. 1999)

("failure to conduct a proper investigation before making a false statement may be sufficiently

reckless to yield False Claims Act liability"); *United States ex rel. Compton v. Midwest

Specialties, Inc.,* 142 F.3d 296 (6th Cir.1998) (holding that defendant who had not properly

tested the nonconforming goods it sold the United States had a reckless disregard for the falsity

of its claim for payment); *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997) (holding that

psychiatrist and wife acted with reckless disregard in submitting incorrect billings where wife

made implausibly high volume of submissions and psychiatrist failed to review the submissions).

*See also U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) ("In defining knowingly,

Congress attempted to reach what has become known as the ostrich type situation where an

individual has buried his head in the sand and failed to make simple inquiries which would alert

him that false claims are being submitted") (internal quotation marks omitted; quoting S. Rep.

No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5286).

## III.   Defendants' Proposed Interpretation of Section 3729(a)(1)(G) Should be Rejected

### A.  Defendants' Construction of "Identified" in the Affordable Care Act Would Render the Second Clause of 31 U.S.C. § 3729(a)(1)(G) Meaningless

Defendants attempt to escape liability by adopting an interpretation of "identified" within

the Affordable Care Act, that would eviscerate the return and reporting requirements of that Act, and further, erroneously limit FCA liability flowing from a provider's failure to return an identified overpayment.  Specifically, defendants argue that so long as a potential overpayment is "unconfirmed" it remains unidentified.  *See* Mot. at 12.  Moreover, defendants' suggest that there is no obligation, much less a deadline for when a provider must "confirm" an overpayment.  Mot. at 9-12.  Defendants' interpretation of "identified" would mean that a provider could choose when, or if, to start the 60 day clock for returning an overpayment, no matter how much information it possessed regarding the overpayment.  Accordingly, a provider could forever forestall its obligation to return an overpayment and, according to defendants, escape False Claims Act liability, so long as it ignored evidence of overpayments.

This flatly contradicts CMS's view, as articulated in the context of the MA and Part D plan report and return requirements, that "actual knowledge" is not required by 42 U.S.C. § 1320(d)-7k, but reasonable diligence is.  *See* CMS Rule Announcement, 79 Fed. Reg. at 29,923-24 (explaining that "reasonable diligence might require an investigation conducted in good faith and in a timely manner qualified individuals in response to credible information of a potential overpayment.").  Further, the Court should reject this highly restrictive construction of 31 U.S.C. § 3729(a)(1)(G) as contrary to the language and clear purpose of the amendment.  *See* S. Rep. No. 111-10, at 14-15, *reprinted in* 2009 U.S.C.C.A.N. 441-42 (a reverse false claim violation is committed "once an overpayment is knowingly and improperly retained," and an "obligation" exists "whether or not the amount owed is yet fixed.").  *See also Lakeshore*, 2013 WL 1307013, at *4 (claim stated under § 3729(a)(1)(G) where complaint alleged defendant failed to investigate).

Further, if defendants' construction of "identify" were construed to limit the reach of

§ 3729(a)(1)(G), it would render the second clause of 31 U.S.C. § 3729(a)(1)(G) virtually ineffective in combating healthcare fraud. *See United States v. Brown*, 333 U.S. 18, 27 (1948) ("No rule of construction necessitates [the Court's] acceptance of an interpretation resulting in patently absurd consequences."); *United States. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) ("In the various contexts in which questions of the proper construction of the [False Claims] Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading."). Permitting a healthcare provider that requests and receives an analysis showing over 900 likely overpayments to escape FCA liability by simply ignoring the analysis altogether and putting its head in the sand would subvert Congress's intent in amending § 3729(a)(1)(G). *See Lakeshore*, 2013 WL 1307013, at *4.

### B. The Government Has Alleged That Defendants Knowingly and Improperly "Avoided" an Obligation to Pay Money to the Government

The Government alleges that Defendants knowingly "avoided" an obligation to pay money to the Government. The False Claims Act creates liability for an entity that "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). As the Senate Judiciary Committee noted, a "reverse" false claim violation is committed "once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment," S. Rep. No. 111-10, at 15, reprinted in 2009 U.S.C.C.A.N. 442; *see also* Merriam-Webster's Collegiate Dictionary (10th ed. 1993) ("Merriam-Webster") (defining "avoid" to mean "to refrain from"). Specifically, the Complaint alleges that after receiving Relator's list identifying the vast majority of overpayments in February 2011, the Defendants refrained from fully repaying Medicaid for the affected claims until March 2013. *See* Compl. at ¶ 35-38. Accordingly, the

19

Government has alleged that Defendants "avoided" an obligation to pay money to the Government.  *See Lakeshore*, 2013 WL 1307013, at *4.

Nevertheless, Defendants contend that some further affirmative act of "avoidance" must be required for liability to attach.  Mot. at 15.  However, the principles of statutory construction require this Court to give meaning to the word "avoid."  *See United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) (internal citations omitted) ("Our starting point in statutory interpretation is the statute's plain meaning, if it has one.  [If] Congress provide[s] no definition of … terms … [w]e … consider the ordinary, common-sense meaning of the words.").  "Avoid" is variously defined, including as "to refrain from."  Merriam-Webster at 80.  This definition accords with Congress's understanding of the reverse false claims provision, which is violated "once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment."  S. Rep. No. 111-10, at 15, *reprinted at* 2009 U.S.C.C.A.N. 442.  Defendants' reliance on the word "avoidance" and its definition as "an act or practice of avoiding … something," *see* Mot. 15, is unavailing as the statute uses "avoid," rather than "avoidance," which is further inconsistent with Congress's intention with respect to the provision.

In short, the False Claims Act provides that liability attaches when one avoids (refrains from) an obligation to pay money to the Government.  31 U.S.C. § 3729(a)(1)(G).  The Government has alleged that defendants had an obligation to pay the Government for over-payments received from Medicaid and knowingly *refrained from* doing so for nearly two years, *see* Compl. at ¶¶ 35-38, and thus has alleged a violation of 31 U.S.C. § 3729(a)(1)(G).

## IV.    AVOIDING AN OBLIGATION TO PAY MONEY TO MEDICAID GIVES RISE TO LIABILITY UNDER THE FALSE CLAIMS ACT

The False Claims Act has long been a vital tool in the fight against Medicare and Medicaid fraud.  *See Mikes*, 274 F.3d 687, 692 (2d Cir. 2001) (citing S. Rep. No. 99–345, at 2–4,

8 (1986)).   The second clause of Section 3729(a)(1)(G), like that provision's first clause and like the remainder of the False Claims Act, unquestionably reaches the Medicaid program, more than half of which is funded by the federal government.   *See Lakeshore*, 2013 WL 1307013, at *1; *see e.g. United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 649-56 (S.D.N.Y 2011).   Indeed, in defining an "overpayment" for the purposes of 31 U.S.C. § 3729(a)(1)(G), Congress specifically included overpayments owed to the Medicaid program.   *See* 42 U.S.C. § 1320a-7k(d)(4)(B) (specifically referring to "funds that a person receives or retains under subchapter … XIX," *i.e.*, 42 U.S.C. § 1396 *et seq.,* the Medicaid Program.).   Accordingly, there can be no doubt that Defendants failure to repay overpayments to the Medicaid program constitutes a violation of 31 U.S.C. § 3729(a)(1)(G).

Nonetheless, defendants assert that the Supreme Court's decision in *Allison Engine* mandates a different conclusion.   *See* Mot. at 19 (citing *Allison Engine*, 553 U.S. 662).   *Allison Engine* concerned the question of whether what were then Sections 3729(a)(2) and (a)(3)[4] of the FCA could be violated where a subcontractor submitted a false invoice to a prime contractor, which in turn would submit a bill to the United States.   *See Allison Engine,* 553 U.S. at 671-72. Relying on the statutory text of § 3729(a)(2), the Supreme Court held that the Government would have to show that the subcontractor had "made a false record or statement" for the purpose of getting "a false or fraudulent claim paid or approved by the Government."  (internal quotation marks omitted)   *Id.* at 671.   The Court also held that § 3729(a)(3), the FCA's conspiracy

---

[4] In effect prior to the 2009 FERA amendment, 31 U.S.C. §  3729(a)(2) provided liability for a person who  "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  *See* 31 U.S.C. § 3729(a)(2) (2000).  The pre-FERA § 3729(a)(3), which is the FCA's conspiracy provision, was renumbered as amended §  3729(a)(1)(C) after FERA.

provision, similarly demanded that the Government show "that the conspirators intended 'to defraud the Government.'"  *Id.* at 672.

Less than a year later in 2009, however, Congress amended the FCA to overturn *Allison Engine*, as well as the D.C. Circuit's decision in *U.S. ex rel. Totten v. Bombardier Corp*, 380 F.3d 488, 490 (D.C. Cir. 2004), which held that § 3729(a)(1) required that "claims must be presented to an officer or employee of the Government before liability can attach."   In 2009, Congress eliminated the presentment requirement from § 3729(a)(1) and overturned *Allison Engine's* holding regarding § 3729(a)(2) and (a)(3).  The Senate Judiciary Committed noted:

> In *Allison Engine*, the Supreme Court held that Section 3729(a)(2) of the FCA requires the Government to prove that 'a defendant must intend that the Government itself pay the claim,' for there to be a violation. 128 S. Ct. at 2128.  As a result, even when a subcontractor in a large Government contract knowingly submits a false claim to general contractor and gets paid with Government funds, there can be no liability unless the subcontractor intended to defraud the Federal Government, not just their general contractor.  This is contrary to Congress's original intent in passing the law and creates a new element in a FCA claim and a new defense for any subcontractor that are inconsistent with the purpose and language of the statute.  Similarly, in *Totten*, the Court of Appeals for the District of Columbia Circuit held that liability under the FCA can only attach if the claim is "presented to an officer or employee of the Government before liability can attach." 380 F. 3d at 490.  Known as the "presentment clause," the D.C. Circuit interpreted this clause to limit recovery for frauds committed by a Government contractor when the funds are expended by a Government grantee, such as Amtrak.  The *Totten* decision, like the *Allison Engine* decision, runs contrary to the clear language and congressional intent of the FCA by exempting subcontractors who knowingly submit false claims to general contractors and are paid with Government funds.

S. Rep. No. 111-10, at 10-11, reprinted at 2009 U.S.C.C.A.N. 438.

Congress further made clear that these amendments were designed not only to capture claims submitted by subcontractors to general contractors, but also to ensure that FCA liability attached to Medicaid claims:

> As some defendants have argued that *Totten* and [*United States ex rel. Atkins v. McInteer*, 345 F. Supp. 2d 1302 (N.D. Ala. 2004), *aff'd on other grounds*, 470 F.3d 1350 (11th Cir. 2006)] restrict FCA liability from attaching to Medicaid claims, the bill clarifies the position taken by the Committee in 1986 that *the FCA reaches all false claims submitted*

> *to State administered Medicaid programs.* By removing the offending language from
> section 3729(a)(1), which requires a false claim be presented to "an officer or employee
> of the Government, or to a member of the Armed Forces," the bill clarifies that direct
> presentment is not required for liability to attach. This is consistent with the intent of
> Congress in amending the definition of 'claim' in the 1986 amendments to include "any
> request or demand * * * for money or property which is made to a contractor, grantee, or
> other recipient if the United States Government provides any portion of the money or
> property which is requested or demanded, or if the Government will reimburse such
> contractor, grantee, or other recipient for any portion of the money or property which is
> requested or demanded." 31 U.S.C. Sec. 3729(c) (2000).

*Id.*, at 11, reprinted at 2009 U.S.C.C.A.N. 438-39 (emphasis added).

Despite this thorough repudiation of *Allison Engine* and *Totten's* holdings, and

Congress's express concern for ensuring the FCA reached Medicaid claims, defendants still

assert that *Allison Engine*'s "rationale" with regard to § 3729(a)(2) should be extended to §

3729(a)(1)(G). *See* Mot. at 20. As an initial matter, however, *Allison Engine* based its holding

on the specific statutory language of § 3729(a)(2) and (a)(3) – specifically, the meaning and

import of the words "to get" in § 3729(a)(2) and "getting" in § 3729(a)(3). The Supreme Court

elaborated that:

> Under subsection (a)(2), however, the defendant must make the false record or statement
> "to get" a false or fraudulent claim "paid or approved by the Government." "To get"
> denotes purpose, and thus a person must have the purpose of getting a false or fraudulent
> claim "paid or approved by the Government" in order to be liable under § 3729(a)(2).
> Additionally, getting a false or fraudulent claim "paid . . . by the Government" is not the
> same as getting a false or fraudulent claim paid using "government funds." Under §
> 3729(a)(2), a defendant must intend that the Government itself pay the claim.

*Id*. (citations omitted); s*ee also Id*. at 672-73 ("[w]here the conduct that the conspirators are

alleged to have agreed upon involved the making of a false record or statement, it must be shown

that the conspirators had the purpose of 'getting' the false record or statement to bring about the

Government's payment of a false or fraudulent claim.").

The language upon which *Allison Engine* relied, however, does not appear in the reverse

false claims provision of the FCA. The amendment to the reverse false claims provision is

parallel to the FERA amendment to § 3729(a)(2), which was enacted for the sole purpose of overruling *Allison Engine.*  There, Congress struck the problematic words "to get" and replaced them with "material to," eliminating the intent requirement that the Supreme Court had injected into that provision.  *See* S. Rep. at 110-10, at 12, *reprinted in* 2009 U.S.C.C.A.N. 439; *Allison Engine*, 553 U.S. 669 (discussing "intent" requirement created by words "to get"). Similarly, Congress struck the language "to conceal, avoid, or decrease" appearing in § 3729(a)(1)(G), replacing them with "material to."  *See id.* at 22.

Further, *Allison Engine* addressed whether liability attached, under either 31 U.S.C. §§ 3729(a)(2) or (a)(3), to a subcontractor who presented a false certification to a *private entity* receiving government funds.  *See* 553 U.S. 672.  In stark contrast, the Medicaid program is a federal program and Congress considers claims to the Medicaid program to be synonymous with claims to the Government.  *See* S. Rep. No. 99-345, at 22, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5287.   Indeed, Congress has consistently rejected defendant's position that Medicaid claims are not reachable under the FCA.  As the Senate report that accompanied the 1986 amendments to the False Claims Act noted, claims submitted to the Medicaid program, even though they are less direct than claims to the Medicare program are still considered claims to the United States.  *See id.* ("Although the Federal involvement in the Medicaid program is less direct, claims submitted to State agencies under this program have also been held to be claims to the United States under the False Claims Act.").  Similarly, in rejecting *Allison Engine,* Congress called the decision "erroneous" and stated that "the bill clarifies the position taken by the Committee in 1986 that the False Claims Act reaches all false claims submitted to State administered Medicaid programs."  S. Rep. No. 111-10, at 11, *reprinted in* 2009 U.S.C.C.A.N. 438.

**V.    IF THE COURT DETERMINES THE COMPLAINT IS INADEQUATELY PLEAD, THE GOVERNMENT REQUESTS LEAVE TO AMEND**

The Government respectfully requests that, in the event any of its claims are deemed deficient, the Government be given an opportunity to amend the Complaint to cure the deficiency.  Rule 15(a)(2) provides that a court should "freely give leave [to amend] when justice so requires."  "Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend," *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986), and dismissal of a complaint without granting an opportunity to plead fraud with greater specificity constitutes an abuse of discretion, *id.* at 57.  Here, dismissal of the Government's claims with prejudice — without allowing the Government the benefit of the Court's rulings regarding the pleading requirements — would be inappropriate given the liberal nature of Rule 15(a).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint should be denied.

Respectfully Submitted,

PREET BHARARA
UNITED STATES ATTORNEY
Southern District of New York
*Counsel for the United States*

 s/ Rebecca C. Martin
REBECCA C. MARTIN
JEAN-DAVID BARNEA
JACOB M. BERGMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2714/2679/2776
Fax: (212) 637-2686
Email: rebecca.martin@usdoj.gov
           jean-david.barnea@usdoj.gov
           jacob.bergman@usdoj.gov