UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT P. KANE,
By and on Behalf of the United States of America,
Relator,

State of New York, *ex rel.*
Robert P. Kane, Relator,

State of New Jersey, *ex rel.*
Robert P. Kane, Relator,

– against –

HEALTHFIRST, INC., *et al.*,

                              Defendants.

STATE OF NEW YORK and UNITED STATES OF
AMERICA,

                              Plaintiff-Intervenors,

– against –

CONTINUUM HEALTH PARTNERS, INC.; BETH
ISRAEL MEDICAL CENTER d/b/a MOUNT SINAI
BETH ISRAEL; ST. LUKE'S-ROOSEVELT
HOSPITAL CENTER d/b/a MOUNT SINAI ST.
LUKE'S and MOUNT SINAI ROOSEVELT,

                              Defendants.

**OPINION AND ORDER**

11 Civ. 2325 (ER)

Ramos, D.J.:

        Relator Robert P. Kane ("Kane" or the "Relator") filed this case in 2011 as a *qui tam*

action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and related state laws.[1]

---

[1] Pursuant to the False Claims Act ("FCA") and New York False Claims Act ("NYFCA"), a private citizen, known as a "relator," with personal knowledge of fraud may file a *qui tam* action, in which he brings suit for himself and for the government and/or state in exchange for a share of the damages if the suit prevails. *See* 31 U.S.C. § 3730(b); N.Y. State Fin. Law § 189; *see also U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 327 (S.D.N.Y. 2004)

In 2014, after investigating Kane's allegations, the United States Government (the "United States" or "Government") and the State of New York ("New York") elected to intervene as plaintiffs against three of the defendants named in Kane's Complaint.  Presently before the Court are those defendants' motions to dismiss the United States' and New York's Complaints-in-Intervention, Docs. 20, 21, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  Docs. 54, 52.  For the following reasons, both motions are DENIED.

## I.      BACKGROUND

### A.      Factual Background[2]

This action stems from a software glitch on the part of Healthfirst, Inc. ("Healthfirst"), a private, non-profit insurance program, which caused three New York City hospitals to submit improper claims seeking reimbursement from Medicaid[3] for services rendered to beneficiaries of a managed care program administered by Healthfirst.  Gov't Compl. (Doc. 20) ¶¶ 3-4, 20, 31-32. The hospitals—Beth Israel Medical Center d/b/a Mount Sinai Beth Israel ("Beth Israel"), St. Luke's-Roosevelt Hospital Center d/b/a Mount Sinai St. Luke's and Mount Sinai Roosevelt

---

(quoting *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016 (7th Cir. 1999)).  Once a *qui tam* action has been initiated, it is the Government's prerogative either to intervene in and prosecute the case or to decline to intervene, thereby permitting the relator to proceed alone.  *See id.*

[2] The "Facts" sections of the Complaints filed by the United States and New York are virtually, if not completely, identical, although their paragraph numbering does not perfectly overlap.  *See* Gov't Compl. (Doc. 20) ¶¶ 16-39; New York Compl. (Doc. 21) ¶¶ 19-42.  For clarity, the Court includes citations only to the United States' Complaint.

[3] In 1965, pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, Medicaid was established as a joint federal and state program to provide financial assistance for medical care to individuals with low incomes. Gov't Compl. ¶ 16.  "Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates and program administration in accordance with certain federal statutory and regulatory requirements.  The state pays the health care providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payment from accounts that draw on the United States Treasury."  *Id.* (quoting 42 C.F.R. §§ 430.0–30).  New York's Medicaid system, which is administered by the State Department of Health ("DOH"), was created by the State Legislature in 1966.  *Id.* ¶ 17 (citing N.Y. Pub. Health Law § 201(1)(v)).

("SLR"), and Long Island College Hospital ("LICH" and, collectively, the "Hospitals")[4]—all belonged to a network of non-profit hospitals operated and coordinated by Continuum Health Partners, Inc. ("Continuum"). *Id.* ¶ 3.[5]  All three Hospitals were also members of the Healthfirst hospital network and provided care to numerous patients enrolled in Healthfirst's Medicaid managed-care plan. *Id.* ¶ 5.

Pursuant to a contract entered into by Healthfirst and the New York State Department of Health ("DOH") on October 1, 2005, Healthfirst provides certain "Covered Services," including hospital and physician services, to its Medicaid-eligible enrollees in exchange for a monthly payment from DOH. *Id.* ¶ 21.[6]  Healthfirst's reimbursement for the Covered Services is limited to that monthly fee; it may *not* otherwise bill DOH on a "fee-for service" or other basis. *Id.*  All doctors, hospitals, and providers that participate in the Healthfirst network must agree that the payment they receive from Healthfirst for Covered Services rendered to Healthfirst's Medicaid enrollees will constitute payment in full for those services, except for co-payments that may be

---

[4] LICH, although named as a defendant in Kane's initial Complaint, is not named in the Intervenor-Complaints filed by the Government and New York. *See* Docs. 20, 21.  Moreover, on July 15, 2014, Kane filed a Notice of Voluntary Dismissal pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, dismissing LICH and the other hospitals—besides Beth Israel and SLR—from the action. *See* Doc. 33.

[5] Continuum is a not-for-profit corporation that, at all relevant times, was a member of various not-for-profit hospitals, including the Hospitals named in this action. Gov't Compl. ¶ 13.  In September 2013, Continuum and the Mount Sinai Hospital System merged certain aspects of the two hospital systems, bringing Beth Israel and SLR under the auspices of the newly created Mount Sinai Hospitals Group, Inc. ("Mount Sinai Hospitals Group") the sole member of each. *Id.*

[6] Pursuant to the Social Security Act, states may use managed-care organizations ("MCOs") to deliver Medicaid benefits and may require that individuals enroll with an MCO as a condition of receiving those benefits. *Id.* ¶ 18 (citing 42 U.S.C. § 1396u–2(a)(1)(A)).  New York established a "managed care program," known as the Medicaid Managed Care ("MMC") Program, in Article 5 Title 11 of its Social Services Law. *Id.* (citing N.Y. Soc. Serv. Law § 364–j).  Additionally, pursuant to Article 44 of the New York Public Health Law, DOH is authorized to certify Health Maintenance Organizations ("HMOs") to operate as MCOs within the State, with their operation and structure governed by State law. *Id.* ¶¶ 18-19 (citing N.Y. Pub. Health Law. § 4400 *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 10, pt. 98).  The DOH also authorizes Prepaid Health Services Plans ("PHSPs"), special-purpose New York HMOs in which a "substantial portion" of enrollees must be beneficiaries of government healthcare programs like Medicaid. *Id.* ¶ 19 (citing N.Y. Comp. Codes R. & Regs. tit. 10, pt. 98-1.1, 9.8-1.2(ff); N.Y. Pub. Health Law § 4403–a(1)).

collected from enrollees where applicable.  *Id.*  Healthfirst contracts with such providers

("Participating Providers") and pays them for the Covered Services they render to Healthfirst's

Medicaid-eligible enrollees; in turn, Healthfirst is compensated through DOH's monthly

payments.  *Id.*

      The error giving rise to the instant controversy relates to electronic remittances, issued by

Healthfirst to its Participating Providers, which indicated the amount of any payment due for

services rendered by the provider.  *Id.* ¶ 30.  These remittance statements also contained "codes"

that signaled whether a provider could seek additional payment from secondary payors in

addition to Healthfirst, such as Medicaid, other insurance carriers, or patients themselves.  *Id.*

The remittances submitted by Healthfirst for Covered Services rendered to its Medicaid-eligible

enrollees should have contained codes informing providers that they could *not* seek secondary

payment for such services, with the limited exception of co-payments from certain patients.  *Id.*

      Beginning in 2009, however, due to a software glitch, Healthfirst's remittances to

Participating Providers erroneously indicated that they *could* seek additional payment for

Covered Services from secondary payors.  *Id.* ¶ 31.  Consequently, electronic billing programs

used by numerous Participating Providers automatically generated and submitted bills to

secondary payors, including Medicaid.  *Id.*  Starting in or around January 2009, Continuum

submitted claims to DOH on behalf of the Hospitals seeking additional payment for Covered

Services rendered to Healthfirst enrollees, and DOH mistakenly paid the Hospitals for many of

those improper claims.  *Id.* ¶ 32.

      In September 2010, auditors from the New York State Comptroller's office (the

"Comptroller") approached Continuum with questions regarding the incorrect billing.  *Id.* ¶ 33.

Eventually, discussions among the Comptroller, Continuum, and the software vendor revealed

4

that the problem occurred when the codes used in Healthfirst's billing software were "translated" to codes used in Continuum's billing software.  *Id.*  On December 13, 2010, approximately two years after the problem first arose, the vendor provided a corrective software patch designed to prevent Continuum and other providers from improperly billing secondary payors like Medicaid for services provided to Healthfirst enrollees, along with an explanatory memorandum.  *Id.* After the problem was discovered, Continuum tasked its employee, Relator Kane, with ascertaining which claims had been improperly billed to Medicaid.  *Id.* ¶ 34.  In late 2010 and early 2011, Kane and other Continuum employees reviewed Continuum's billing data in an effort to comprehensively "identify" all claims potentially affected by the software glitch.  *Id.*  In January 2011, the Comptroller alerted Continuum to several additional claims for which Continuum had billed Medicaid as a secondary payor.  *Id.*

On February 4, 2011, approximately five months after the Comptroller first informed Continuum about the glitch, Kane sent an email to several members of Continuum's management, attaching a spreadsheet that contained more than 900 Beth Israel, SLR, and LICH claims—totaling over $1 million—that Kane had identified as containing the erroneous billing code.  *Id.* ¶ 35.  His email indicated that further analysis would be needed to confirm his findings and stated that the spreadsheet gave "some insight to the magnitude of the issue."  *Id.*, Ex. B. There is no dispute that Kane's spreadsheet was overly inclusive, in that approximately half of the claims listed therein were never actually overpaid; nor is there any dispute that the spreadsheet correctly included "the vast majority of the claims that had been erroneously billed."

*Id.* ¶ 35.[7]  On February 8, 2011, four days after sending his email and spreadsheet, Kane was terminated.  *Id.* ¶ 36.[8]

According to the United States and New York, Continuum "did nothing further" with Kane's analysis or the universe of claims he identified.  *Id.*  In February 2011, Continuum reimbursed DOH for only five improperly submitted claims.  *Id.*  Meanwhile, the Comptroller conducted further analysis and identified several additional tranches of wrongful claims, which it brought to Continuum's attention starting in March 2011 and continuing through February 2012. *Id.* ¶ 37.  The United States and New York allege that although Continuum began to reimburse DOH for improperly billed claims in April 2011, it did not conclude until March 2013, "fraudulently delaying its repayments for up to two years after Continuum knew of the extent of the overpayments."  *Id.* ¶ 38.  In addition, it was not until the Government issued a Civil Investigative Demand ("CID") in June 2012, seeking additional information about the overpayments, that Continuum finally reimbursed DOH for more than 300 of the affected claims. *Id.*  They further allege that "Continuum never brought Kane's analysis to the attention of the Comptroller despite many communications with the Comptroller concerning additional claims to be repaid."  *Id.*

By "intentionally or recklessly" failing to take necessary steps to timely identify claims affected by the Healthfirst software glitch or timely reimburse DOH for the overbilling, the United States and New York allege, Defendants violated the False Claims Act and its New York corollary.  *Id.* at ¶ 39.

---

[7] *But see* Defs.' Mem. Law Supp. Mot. to Dismiss at 14 n. 7 (comparing Kane's spreadsheet with the Government's Complaint, and finding that Kane omitted $21,000 in overpayments from his spreadsheet).

[8] Kane's termination is the basis for his allegation that Continuum retaliated against him in violation of 31 U.S.C. § 3730(h) by terminating him as a result of his initiation of this action.  *See* Amended Compl. ¶¶ 88-94 (Doc. 26). His retaliation claim is not addressed by the instant motions to dismiss.

B.        **Procedural Background**

Kane filed this action on April 5, 2011, for himself and on behalf of the United States, the State of New York, and the State of New Jersey, asserting claims under the FCA, the New York State False Claims Act ("NYFCA"), State Fin. Law §§ 187 *et seq.*, and the New Jersey False Claims Act ("NJFCA"), N.J. Stat. Ann. § 2A:32C–1, *et seq.* Compl. (Doc. 22).[9]  He named as defendants numerous hospitals and health care organizations that provide government subsidized health care services in New York and New Jersey and had accidentally billed Medicaid for Covered Services and then failed to timely report and return payments submitted by Medicaid in response to those bills. *Id.*  Kane filed an Amended Complaint on May 15, 2014.  Amended Compl. ¶¶ 1-2 (Doc. 26).

Meanwhile, in June 2012, the Government issued a CID to Continuum in connection with its investigation of Kane's allegations, requesting information about the claims submitted for Covered Services rendered to Healthfirst Medicaid enrollees.  New York Compl. (Doc. 21) ¶ 8.  At the end of this investigation, the United States Attorney's Office for the Southern District of New York, on behalf of the United States Department of Health and Human Services ("HHS"), and the State of New York, acting through its State Office of the Attorney General, Medicaid Fraud Control Unit, elected to intervene as plaintiffs against three defendants:  Continuum, Beth Israel, and SLR (collectively, "Defendants").  *See* Gov't's Notice of Election to Intervene in Part (Doc. 25); New York's Notice of Election to Intervene in Part (Doc. 27).[10]  Both the United States and New York filed Complaints-in-Intervention on June 27, 2014.  Docs. 20, 21.

---

[9] As is required in a *qui tam* action, Kane's Complaint and Amended Complaint were filed under seal, Docs. 1, 14, and were unsealed on June 27, 2014 as Docs. 22 and 26 when the Intervenor-Plaintiffs filed their complaints.

[10] Although Kane filed suit on behalf of the State of New Jersey as well as the United States and New York, New Jersey declined to intervene in this action.  *See* State's Notice of Election to Decline Intervention (Doc. 36).

The United States asserts that Defendants violated the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G).  *See* Gov't's Compl. ¶ 28.  New York asserts that Defendants violated State Financial Law § 189(1)(h), a similar "reverse false claims" provision contained in the NYFCA.  *See* Doc. 21 ¶ 31.  Both attached two exhibits to their Complaints: (1) a list of the erroneous claims submitted by Beth Israel, SLR, and LICH as a result of the software glitch, and their subsequent histories;[11] and (2) Kane's February 4, 2011 email and approximately 900-claim spreadsheet of potential overpayments.  Docs. 20, 21.  The United States seeks treble damages, plus an $11,000 penalty for each improperly retained overpayment.  Gov't's Compl. at 12.  New York also seeks treble damages, along with a $12,000 penalty for each overpayment.  On September 22, 2014, Defendants filed motions to dismiss both Intervenor-Complaints.  Docs. 52, 54.

## C.   Statutory Framework

### 1.   The False Claims Act and the Fraud Enforcement and Recovery Act

Congress enacted the FCA, also known as the "Informer's Act" or the "Lincoln Law," in 1863 in order "to combat rampant fraud in Civil War defense contracts."  S. Rep. No. 345, 99th Cong., 2d Sess. (1863), *reprinted in* 1986 U.S.C.A.A.N. 5266); *see also U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 327 & n. 72 (S.D.N.Y. 2004) (quoting *Mikes v. Straus*, 274 F.3d 687, 692 (2d Cir. 2001); *U.S. ex rel. Graber v. City of New York*, 8 F. Supp. 2d 343, 352 (S.D.N.Y. 1998)).  "The Supreme Court has given the statute an expansive reading, observing that it covers all fraudulent attempts to cause the Government to pay out sums of money."  *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006) (internal quotation marks

---

[11] This spreadsheet captures numerous pieces of information for each alleged overpayment, such as the claim number, hospital name, date of service, date of billing, amount billed, primary payor, secondary payor, amount repaid, and date repaid.

omitted) (quoting *United States v. Neifert–White Co.,* 390 U.S. 228, 232-33 (1968); *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 733 ("*ATMI*") (6th Cir. 1999)).

More than a century after the FCA was initially signed into law, Congress determined that the "growing pervasiveness of fraud necessitate[d] modernization of the Government's primary litigative tool for combatting fraud."  S. Rep. No. 99–345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.  In 1986, Congress amended the FCA "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government."  *Id.*  The so-called "reverse false claims" provision at issue in this litigation was added at that time.  *Id.* at 5280.  As enacted, the reverse false claims provision imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).  It is described as the "reverse false claims" provision "because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction."  *Bahrani*, 465 F.3d at 1195 (quoting *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.,* 370 F. Supp. 2d 993, 998 (N.D. Cal. 2005)).

 The 1986 amendments also raised the fixed statutory penalty for FCA violations, which had not been altered since the Act's initial passage, such that a party found to have violated the Act, including the reverse false claims provision, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, to be adjusted for inflation.[12]  In so doing, Congress "reaffirm[ed] the apparent belief of the act's initial drafters that defrauding

---

[12] The FCA as enacted in 1863 set a fixed statutory penalty of $2,000 per false claim.  S. Rep. 99-345, 17, 1986 U.S.C.C.A.N. 5266, 5282.  The 1986 amendments included a penalty range of $5,000 to $10,000 for each false claim, including reverse false claims, to be adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. S. Rep. 111-10, 22, 2009 U.S.C.C.A.N. 430, 444.  Today, due to inflation, the available penalty is a range of $5,500 to $11,000.  Gov't Compl. ¶ 28.

the Government is serious enough to warrant an automatic forfeiture rather than leaving fine

determinations with district courts, possibly resulting in discretionary nominal payments."

S. Rep. No. 99–345, at 17 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5282.  Additionally, the

1986 amendments increased the Government's recoverable damages in FCA cases from double

to treble.  *Id.*  Finally, among the other 1986 changes was the adoption of a provision granting

"Civil Investigative Demand" or CID authority to the Civil Division of the United States

Department of Justice.  *Id.* at 5280.

Twenty-three years later, in 2009, Congress passed the Fraud Enforcement and Recovery

Act ("FERA"), which further amended the FCA and its reverse false claims provision.  Pub. Law

111-21, 123 Stat. 1617, 1621-25 (2009).  Prior to the 2009 amendments, the reverse false claims

provision left a "loophole" that excused from liability the concealment, avoidance, or decreasing

of an obligation to return to the Government "money or property that is knowingly retained by a

person even though they have no right to it."  S. Rep. 111-10, 13-14, 2009 U.S.C.C.A.N. 430,

441.  As amended by the FERA, the reverse false claims provision now imposes liability for any

person who "knowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the Government, or knowingly

conceals or *knowingly and improperly avoids or decreases an obligation* to pay or transmit

money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  As

defined in the FCA, the terms "knowing" and "knowingly" encompass "actual knowledge," as

well as situations in which a person "acts in deliberate ignorance" or "reckless disregard" of the

truth or falsity of information.  *Id.* § 3729(b)(1)(A).  This knowledge standard expressly requires

no proof of specific intent to defraud.  *Id.* § 3729(b)(1)(B).

In addition, the FERA aimed to address a "confusion" that had arisen among several courts that had "developed conflicting definitions of the term 'obligation,'" which previously was not defined in the FCA.  *See* S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441 (citing *ATMI*, 190 F.3d 729, 736 (6th Cir. 1999); *U.S. ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 95 (D. Me. 1996)); *see also U.S. ex rel. Dunleavy v. Cnty. of Delaware*, No. 94 Civ. 7000 (TNO), 1998 WL 151030, at *3 n. 8 (E.D. Pa. Mar. 31, 1998) ("The parties argue extensively over how broadly to interpret the term 'obligation' in § 3729(a)(7) and there [have] been considerable differences of opinion in the lower courts.").  In direct response to those conflicting court decisions, the FERA amended the FCA by defining an "obligation" as "an *established duty, whether or not fixed, arising from* an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from *the retention of an overpayment*."  31 U.S.C. § 3729(b)(3) (emphasis added); *U.S. ex rel. Stone v. OmniCare, Inc.*, No. 09 Civ. 4319 (JBZ), 2011 WL 2669659, at *3 (N.D. Ill. July 7, 2011).

### 2.    The Patient Protection and Affordable Care Act

In 2010, less than a year after the FERA was signed into law, Congress passed the Patient Protection and Affordable Care Act of 2010 ("ACA"), a broad healthcare reform statute that, as relevant to these proceedings, included a provision prohibiting retention of Government overpayments in the healthcare context.  *See* Pub. L. 111–148, 124 Stat. 119; *Stone*, 2011 WL 2669659, at *3.  Specifically, the ACA requires a person who receives an overpayment of Medicare or Medicaid funds to "report and return" the overpayment to HHS, the State, or another party if appropriate.  42 U.S.C. § 1320a-7k(d)(1).  The statute sets a deadline for such reporting and returning:  An overpayment must be reported and returned within sixty days of the "date on which the overpayment was *identified*" (the "sixty-day rule" or "report and return"

provision), and any overpayment retained beyond that point constitutes an "obligation" carrying liability under the FCA.  *Id.* §§ 1320a-7k(d)(2)-(3) (emphasis added).  More simply stated, the ACA provides that any person who has received an overpayment from Medicare or Medicaid and knowingly fails to report and return it within sixty days after the date on which it was identified has violated the FCA.  *Id.* § 1320a-7k(d).

The report and return provision does not actually deploy the terms "knowing" or "knowingly," but the provision contains its own succinct "Definitions" section, which states that provides that "knowing" and "knowingly" should "have the meaning given those terms in [the FCA]."  *Id.* § 1320a-7k(d)(4)(A).  However, Congress did *not* define the pivotal word "identified," which triggers the sixty-day report and return clock, in the text of the ACA.  Its meaning governs the outcome of the motions before the Court.

### 3.    The New York False Claims Act

The NYFCA, "closely modeled on the federal FCA," was enacted on April 1, 2007. 2007 N.Y. Sess. Laws, Ch. 58, S. 2108-c, § 93(5) (Apr. 9, 2007); *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014).  It has a similar penalty scheme as well: Under the NYFCA, the State of New York is entitled to recover three times the amount of each improper claim and, for each claim or overpayment, a civil penalty of not less than $6,000 and not more than $12,000.  State Fin. Law § 188(3).  When interpreting the NYFCA, New York courts rely on federal FCA precedent.  *Bilotta*, 50 F. Supp. 3d at 509 (quoting *United States ex rel. Corp. Compliance Assocs. v. New York Soc. for the Relief of the Ruptured and Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292 (PKC), 2014 WL 3905742, at *11 (S.D.N.Y. Aug. 7, 2014)).

Section 189(1)(h) of the NYFCA, which New York contends Defendants violated,
provides that a person violates the NYFCA if he or she "knowingly conceals or knowingly and
improperly avoids or decreases an obligation to pay or transmit money or property to the state or
a local government, or conspires to do the same[.]" *New York Soc.*, 2014 WL 3905742, at *11.
It is identical to the second clause of the FCA's reverse false claims provision, 31 U.S.C.
§ 3729(a)(1)(G), but applies to obligations to pay the State government or a local government
rather than the federal government.  Like the FCA, the NYFCA defines an "obligation" to
include "retention of an overpayment," State Fin. Law § 188(4), and defines "knowing" to
include reckless disregard or deliberate ignorance to the truth or falsity of information.  *Id.*
§§ 188(3)(a)(ii)-(iii).

The reverse false claims provision, § 189(1)(h), was not included in the statute as initially
enacted in 2007.  *See* State Fin. Law § 189 (2007).   Rather, the New York State Legislature
amended the NYFCA in March 2013 to include it, thereby incorporating into the Act those
provisions of the federal FCA implemented by the FERA.  *See* 2013 N.Y. Sess. Laws, Ch. 56, S.
2606, § 8 (Mar. 28, 2013).

## II.	LEGAL STANDARDS

### A.	Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all
factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's
favor.  *Koch v. Christie's Intern, PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also, e.g.*, *Ruotolo
v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  However, the Court is not required to
credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### B.    Heightened Pleading Standard under Rule 9(b)

Where a plaintiff brings a cause of action that sounds in fraud, the complaint must satisfy the heightened pleading requirements of Rule 9(b) by stating the circumstances constituting fraud with particularity.  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 251 (S.D.N.Y. 2014) (citing *Rombach v. Chang,* 355 F.3d 164, 170-71 (2d Cir. 2004)).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *See Rombach*, 355 F.3d at 170 ("By its terms, Rule 9(b) applies to 'all averments of fraud.'") (quoting Fed. R. Civ. P. 9(b)).  Claims brought under the FCA, a "self-evident[ly] . . . anti-fraud statute," and NYFCA "fall within the express scope of Rule 9(b)."  *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (citing *Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1476-77 (2d Cir. 1995); *U.S. ex rel. Mooney v. Americare, Inc.*, No. 06 Civ. 1806 (FB) (VVP), 2013 WL 1346022, at *2 (E.D.N.Y. Apr. 3, 2013) (noting that claims under the FCA and NYFCA must comply with Rule 9(b)'s heightened pleading standards).

14

Where Rule 9(b) applies, a complaint must:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  *Kester*, 23 F. Supp. 3d at 251-52 (quoting *U.S. ex rel. Polansky v. Pfizer, Inc.,* No. 04 Civ. 704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009)).  Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).

Rule 9(b)'s particularity requirement serves several aims:  "to provide a defendant with fair notice of a plaintiff's claims, to safeguard a defendant's reputation from improvident charges of wrongdoing, . . . to protect a defendant against the institution of a strike suit," and to "discourage[] the filing of complaints as a pretext for discovery of unknown wrongs."  *Kester*, 23 F. Supp. 3d at 252 (citing *Rombach,* 355 F.3d at 171; *Madonna v. U.S.*, 878 F.2d 62, 66 (2d Cir. 1989)).  With these purposes in mind, courts in the Southern District and elsewhere have held in the FCA context that while "there is no mandatory checklist of identifying information that a plaintiff must provide, the complaint must include sufficient details about the false claims such that the defendant can reasonably identify [the] particular false claims for payment that are at issue."  *Id.* at 256 (internal quotation marks and citation omitted).  However, "where the alleged fraudulent scheme is extensive and involves 'numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.'"  *Id.* at 258 (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004)).  Ultimately, whether a

complaint satisfies Rule 9(b) is "a fact-specific inquiry" that depends upon "the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *Bilotta*, 50 F. Supp. 3d at 508 (S.D.N.Y. 2014) (quoting *Kester*, 23 F. Supp. 3d at 258) (internal quotation marks omitted).

## III.      DISCUSSION

### A.      The United States' Complaint

Defendants argue that the United States' Complaint-in-Intervention is insufficient to meet the high bar set by Rule 9(b) because it fails to allege:  (1) that Defendants had an "obligation," (2) that Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation, and (3) that Defendants had an obligation to pay or transmit money to the federal "Government."  The Court rejects each of these propositions.

#### 1.      *The United States Properly Pleads an "Obligation"*

Kane's February 4, 2011 email and spreadsheet, which he sent to Continuum managers, isolated approximately 900 claims that he recognized as containing the erroneous billing code and, therefore, as being potential overpayments.  Approximately half of the items listed did, in fact, constitute overpayments.  The Government argues that Kane's email and spreadsheet properly "identified" overpayments within the meaning of the ACA, and that these overpayments matured into "obligations" in violation of the FCA when they were not reported and returned by Defendants within sixty days.  *See* Gov't's Opp'n to Mot. to Dismiss (Doc. 59) at 4, 14-17.[13]

---

[13] The Government also argues that the FCA on its own, apart from the ACA, captures the conduct at issue:  "While [the ACA] provided a bright line for healthcare providers for when overpayments must be returned and when FCA liability could be triggered, the ACA did not purport to narrow the reverse false claims provision of the FCA, which has wide application to all types of overpayments, *i.e.*, not simply Medicare and Medicaid funds 'knowingly retained."  Gov't's Opp'n to Mot. to Dismiss (Doc. 59) at 4.  Because the Court finds that the Government properly pleads an obligation based on the ACA's framework for Medicaid overpayments, it need not address the argument that it is possible, on these facts, to find a violation of the FCA without finding a violation of the ACA.

Defendants, on the other hand, argue that Kane's email only provided notice of *potential* overpayments and did not identify actual overpayments so as to trigger the ACA's sixty-day report and return clock.  *See* Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. (Doc. 55) at 9-14 (citing Gov't's Compl. ¶¶ 7, 35).

In essence, Defendants urge the Court to adopt a definition of "identified" that means "classified with certainty," whereas the Government urges a definition of "identified" that would be satisfied where, as here, a person is put on notice that a certain claim may have been overpaid. The Government's proposal—that "an entity 'has *identified* an overpayment' when it 'has determined, or should have determined through the exercise of reasonable diligence, that [it] has received an overpayment' to 'identify,'" Gov'ts Opp'n to Mot. to Dismiss at 5—treats "identified" as synonymous with "known" as it is defined in the FCA.  Congress did not define the term "identified" in the ACA, and no other court has weighed in on its meaning or on the application of the ACA sixty-day rule.  This case thus presents a novel question of statutory interpretation.

### a.    Plain Meaning

When faced with a question of statutory interpretation, a court's starting point "is the statute's plain meaning, if it has one."  *United States v. Dauray,* 215 F.3d 257, 260 (2d Cir. 2000) (internal citation omitted); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) ("The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.") (internal quotation marks and citations omitted).  Congress having provided no definition for the term "identified," the Court must consider its "ordinary, common-sense meaning."  *Dauray*, 215 F.3d at 260 (citing *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992)).

Dictionary definitions of the word "identify"[14] do not resolve the question, suggesting instead that it is susceptible to more than one meaning.   One prevalent definition is the definition pressed by Defendants:  "to prove the identity of."  Black's Law Dictionary 813 (9th ed. 2009); *see also* Merriam-Webster.com, http://www.merriam-webster.com/dictionary/identify (last visited July 28, 2015) (defining "identify" as "to know and say who someone is or what something is," "to find out who someone is or what something is," and "to show who someone is or what something is); Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/identify (last visited July 28, 2015) (offering, among other definitions, "to establish or indicate who or what (someone or something) is").   Another, albeit less prominent, dictionary definition for the word "identify" is to "recognize or distinguish (especially something considered worthy of attention)."  *Id.*  In keeping with this alternate definition, the Collins dictionary includes among a list of synonyms, "recognize," "name," "pinpoint," "point out," and "spot."  Collins Dictionary, http://www.collinsdictionary.com/dictionary/english/identify?showCookiePolicy=true (last visited July 28, 2015).  Similarly, the Oxford Dictionaries lists as synonyms:  "single out," "pick out," "spot," "point out," "pinpoint," "put a name to," "name," and "distinguish."[15]

---

[14] Neither party proffers a dictionary definition for the word "identify," although both rely on dictionaries elsewhere in their memoranda of law.  Additionally, the dictionaries consulted by the Court provide definitions for "identify" but not for "identified."  Moreover, the potential futility of relying on dictionary definitions to ascertain the meaning of the word "identified" in this case is underscored by a comparison of the definitions provided for "knowing" and "knowingly" in the FCA as compared with available dictionary definitions of those words.  In the FCA, knowing and knowingly are legislatively defined as encompassing both "actual knowledge" and situations in which someone "acts in deliberate ignorance" or "reckless disregard of the truth or falsity of information.  31 U.S.C. § 3729(b)(1)(A).  By so defining these words, Congress has greatly expanded common dictionary definitions of those terms.  For example, the Oxford Dictionaries includes, as a definition of "to know," to "be absolutely certain or sure about something."  Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/know (last visited July 13, 2015).

[15] Another common definition interprets "identify" as meaning as "to associate with."  Oxford (including as definitions:  to "associate . . . closely with," "regard . . . as having strong links with," "equate . . . with," or to "regard oneself as sharing the same characteristics or thinking as someone else").

Here, while Kane did not purport to conclusively prove the identity of any overpayments—and hundreds of the claims he listed had not actually been overpaid—he did "recognize" nearly five hundred claims[16] that did in fact turn out to have been overpaid as worthy of attention.  Given the susceptibility of these facts to multiple dictionary definitions, dictionaries alone cannot decisively resolve the dispute, and the term "identified" has no "plain meaning" as it is used in the ACA.[17]

### b.      Canons of Statutory Interpretation

Where, as here, "the plain meaning of a statute is susceptible to two or more reasonable meanings, i.e., if it is ambiguous, . . . a court may resort to the canons of statutory construction." *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001) (citing *Dauray*, 215 F.3d at 262).  In particular, the Supreme Court and Second Circuit Court of Appeals have held that a term's meaning may be discerned by "looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)); *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 157 (2d Cir. 2007) ("[F]undamental to any task of interpretation is the principle that text must yield to context.")*.*  In this case, four canons of constructions prove helpful:  (1) a court may consult legislative history when

---

[16] *See* Defs.' Mem. L. Supp. Mot. to Dismiss at 13 ("As it turns out, only 465 of the 900 claims were paid, for a total payment of $871,000.") (citing Gov't's Compl., Ex. A); Gov't's Opp'n to Mot. to Dismiss (Doc. 59) at 6 ("Continuum, despite becoming aware of the error and despite having generated a list of approximately 900 claims that had been affected by this error – approximately half of which resulted in a Medicaid overpayment – failed to return most of these overpayments for up to two years.").

[17] Nor is the plain meaning of "identify" evident from its use elsewhere in the ACA. *See, e.g.*, 124 Stat 119, Sec. 3012 ("consistent with the national priorities identified under . . ."); Sec. 931 ("quality measures identified through the Medicaid Quality Measurement Program . . ."); Sec. 3014 ("priority areas identified by the Secretary").  These other uses of the word "identified" in the ACA do not suggest that "identified" carries a particular meaning in the report and returning provision.  In addition, "[i]t is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433-34, (1932) (citation omitted).

interpreting an ambiguous statute; (2) ambiguous statutes should be interpreted in the manner best-suited to carry out their statutory purposes; (3) statutes must be interpreted in a way that avoids absurd results; and (4) agency interpretations of ambiguous statutes may be entitled to some deference.

### i.      Legislative History

"If the meaning of a statute is ambiguous, the court may resort to legislative history to determine the statute's meaning."  *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007) (citations omitted); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 627 (1993) (the court interpreting an unclear statute may consult legislative history to discern "the legislative purpose as revealed by the history of the statute").  In so doing, however, the court "must 'construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results.'"  *Puello*, 511 F.3d at 327 (quoting *Connecticut ex rel. Blumenthal v. United States Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir. 2000)).  Here, even as the Court consults legislative history, it is mindful that this history will not necessarily "settle the dispute." *United States v. Dicristina*, 886 F. Supp. 2d 164, 223 (E.D.N.Y. 2012) *rev'd on other grounds*, 726 F.3d 92 (2d Cir. 2013).  Rather, "[a]s is often the case '[i]n any major piece of legislation, the legislative history is extensive, and there is something for everybody.'"  *Id.* (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 36 (Amy Gutmann, ed. 1997)). In this case, both Defendants and the Government proffer elements of the legislative history to support their interpretations of the statutory scheme.

Defendants argue that the legislative history of the ACA provides a clear answer.  They observe that the initial health reform bill introduced by the House of Representatives in 2009

included a provision that was similar to the "report and return" provision ultimately enacted with the ACA, but which stated that "known," rather than "identified," overpayments had to be reported and returned within sixty days.  Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 9 (citing H.R. 3200, 111th Cong. § 1641 (as introduced by the House, July 14, 2009)).  The bill specified that "known" overpayments retained beyond the sixty-day deadline would constitute "obligations" under the FCA, and that the term "knows" would carry the same meaning as the terms "knowing" and "knowingly" in the FCA.  *Id.*  As referenced above, the FCA's knowledge standard encapsulates recklessness and deliberate ignorance.  *See* 31 U.S.C. § 3729(b)(1).  Unambiguously, the House bill would have imposed liability in circumstances like those before the Court, where a person recklessly fails to uncover or remains deliberately ignorant of an overpayment.

Defendants suggest that Congress's decision to adopt the Senate version of the bill— which included the ACA's current sixty-day rule, using the word "identified" instead of "known"—rather than the House version reveals its intention to impose a higher standard than the FCA's knowledge standard.  Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 9-10 (citing Public L. 111-148 § 6402(a) enacting H.R. 3590, 111th Cong.).  They claim that Congress deliberately used "identified" in order to exempt from FCA liability those healthcare providers who recklessly fail to uncover or remain deliberately ignorant of an overpayment.  *Id.* (citing 31 U.S.C. § 3729(b)(1)).

Defendants cite *I.N.S. v. Cardoza-Fonseca* for the proposition that a term should not be interpreted to carry the same meaning as a word that, during the legislative process, was rejected in favor of the ambiguous term.  480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio*

to enact statutory language that it has earlier discarded in favor of other language.").  While the

facts of that case are readily distinguishable,[18] Congress's choice to use "identified" as opposed

to "known," a term that it expressly defined elsewhere in the ACA report and return provision

but did not use in describing the commencement of the sixty-day clock, cannot be dismissed as

insignificant.  *See Barnhart*, 534 U.S. at 452-53 (observing the "general principle of statutory

construction that when Congress includes particular language in one section of a statute but

omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion") (internal quotation marks

and citations omitted).

However, from this conclusion does not necessarily follow that Congress intended for

"identified" to impose a higher burden on the Government than "known," as Defendants suggest.

While Congress's inclusion of a definition for "knowing" and "knowingly" within the report and

return provision might be offered as proof that Congress understood the meaning of those words

and yet deliberately did not use them, it is equally plausible that Congress included the

definitions of "knowing" and "knowingly" within the ACA's report and return provision in order

to indicate that the FCA's knowledge standard should apply to the determination of when an

---

[18] In *Cardoza-Fonseca*, the Court examined two different provisions in the Immigration and Nationality Act ("INA"), both of which provided avenues for an otherwise deportable alien to seek relief based on possible persecution if deported.  One provision, § 243(h), requires the Attorney General to withhold deportation when an alien demonstrates that his "life or freedom would be threatened" on account of one of several factors if he is deported.  Section 208(a) of the Act offers a second, broader form of relief, authorizing the Attorney General, in his discretion, to grant asylum to an alien who is unable or unwilling to return to his home country due to "persecution or a well-founded fear of persecution."  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).  The Court reviewed an Immigration Judge's use of the same standard in evaluating an individual's applications for withholding of deportation under both provisions and found that Congress had intended to create two different standards via the two separate provisions.  *Id.* at 425.  In the portion of the Court's opinion quoted by Defendant, the Court discussed the fact that Congress had enacted the House rather than the Senate version of the Refugee Act of 1980, which added § 208(a) to the INA.  *Id.* at 432-33.  The Senate version included language, absent from the House version, stating that a refugee would be ineligible for asylum unless "his deportation would be prohibited by § 243(h)."  In other words, the Senate version would have explicitly imposed the same standard on asylum applications under both provisions.

overpayment is deemed "identified."  Moreover, while it is possible, as Defendants assert, that

Congress intended for "identified" to mean "conclusively proven to be an overpayment," it is

more plausible—in light of its legislative aims, analyzed below—that Congress intended for

"identified" to carry a slightly different meaning from "known" that comports with the second

dictionary definition of "identify" noted above, i.e. "pointed out" or "recognized (as)."  This is

particularly so where, as here, the legislative record is silent as to why Congress chose one word

over another that in many contexts might be used synonymously.

        To define "identified" such that the sixty day clock begins ticking when a provider is put

on notice of a potential overpayment, rather than the moment when an overpayment is

conclusively ascertained, is compatible with the legislative history of the FCA and the FERA

highlighted by the Government.  As described above, Congress amended the FCA in 2009 by

including in the FERA a definition of "obligation," in relevant part, as "an established duty,

*whether or not fixed*, arising . . . from the retention of an overpayment."  31 U.S.C. § 3729(b)(3).

A Senate Judiciary Committee report on that bill observed that this definition reflected the

Committee's long-held view that an "obligation" under the FCA "arises across the spectrum of

possibilities from the fixed amount debt obligation where all particulars are defined to the

instance where there is a relationship between the Government and a person that 'results in a

duty to pay the Government money, whether or not the amount owed is yet fixed.'"  S. Rep. No.

111-10, at 14 (2009), *reprinted at* 2009 U.S.C.C.A.N. 430, 441.  The Committee, in its report,

endorsed a case from the Tenth Circuit Court of Appeals, *U.S. ex rel. Bahrani v. Conagra, Inc.*,

465 F.3d 1189 (10th Cir. 2006), for its interpretation of an FCA "obligation."  *See* S. Rep. 111-

10 at 14, n. 14.  In *Bahrani*, the court held that "there are instances in which a party is required to

pay money to the government, but, at the time the obligation arises, the sum has not been

23

precisely determined," *Bahrani*, 465 F.3d at 1201, and noted that "to require a fixed monetary obligation as a prerequisite for a reverse false claims action would be inconsistent with the broad remedial purpose of the False Claims Act." *Id.* at 1202 (citing *Neifert–White*, 390 U.S. at 233).

This legislative history indicates that Congress intended for FCA liability to attach in circumstances where, as here, there is an established duty to pay money to the government, even if the precise amount due has yet to be determined.  Here, after the Comptroller alerted Defendants to the software glitch and approached them with specific wrongful claims, and after Kane put Defendants on notice of a set of claims likely to contain numerous overpayments, Defendants had an established duty to report and return wrongly collected money.  To allow Defendants to evade liability because Kane's email did not conclusively establish each erroneous claim and did not provide the specific amount owed to the Government would contradict Congress's intentions as expressed during the passage of the FERA.

### ii.    Avoiding Absurdity

By the same token, in the process of statutory interpretation, "absurd results are to be avoided and internal inconsistencies in the statute must be dealt with."  *Natural Res. Def. Council, Inc.*, 268 F.3d at 98 (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981); *Dauray*, 215 F.3d at 264).  In this case, both Defendants and the Government maintain that absurd results would follow should the Court adopt the rule proposed by their adversaries.

Defendants argue that it would impose an unworkable burden on healthcare providers to require reporting and returning within sixty days of the identification of *potential* overpayments:

> A review of the steps most health care providers would take after receiving notice of potential overpayments illustrates why requiring the reporting and returning of overpayments within 60 days of such notice imposes an enormous burden on providers that may often be impossible to meet.  Faced with an internal audit that suggests that some percentage of sampled claims for certain procedures have been improperly coded, a provider would likely review the findings by retrieving and

24

reviewing the medical records involved, discussing the cases with the physicians who furnished the services, and consulting with staff with expertise in coding and, possibly, counsel.  If the review confirms the audit determination, there may be a need to extend the audit to review claims outside of the audit sample or to do more sampling from different time periods or different physicians.  The design of that further review will require factual investigation and legal analysis concerning a number of questions including the time period to be covered by the audit, the services to be included in the audit, and the providers to be included in the audit. Assuming that the audit identified overpayments, the provider's reimbursement staff will then have to make arrangements to return the overpayments.  Doing so may require the identification of every specific claim that has been overpaid by claim number, additional governmental identifiers, date of service, patient, and amount billed and paid.

Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 10-11 (emphasis in original) (citing

New York State Office of Medicaid Inspector General, *Self-Disclosure Submission Checklist*

(Rev. 7/14), https://www.omig.ny.gov/images/stories/self_disclosure/self_disclosure-

blue_sheet_july2014.pdf (last visited July 29, 2015)).

Even if the report and return process turns out, in many cases, to be less onerous than the

process described by Defendants, it is certainly the case that the Government's interpretation of

the ACA can potentially impose a demanding standard of compliance in particular cases,

especially in light of the penalties and damages available under the FCA.  Under the definition of

"identified" proposed by the Government, an overpayment would technically qualify as an

"obligation" even where a provider receives an email like Kane's, struggles to conduct an

internal audit, and reports its efforts to the Government within the sixty-day window, but has yet

to isolate and return all overpayments sixty-one days after being put on notice of potential

overpayments.  The ACA itself contains no language to temper or qualify this unforgiving rule; it

nowhere requires the Government to grant more leeway or more time to a provider who fails

timely to return an overpayment but acts with reasonable diligence in an attempt to do so.

However, while such claims might qualify as "obligations," the mere existence of an "obligation" does not establish a violation of the FCA.  Rather, in the reverse false claims context, it is only when an obligation is *knowingly concealed* or *knowingly and improperly avoided or decreased* that a provider has violated the FCA.  Therefore, prosecutorial discretion would counsel against the institution of enforcement actions aimed at well-intentioned healthcare providers working with reasonable haste to address erroneous overpayments.  Such actions would be inconsistent with the spirit of the law and would be unlikely to succeed.  Lawyers for the Government suggested as much during a pre-motion conference last fall:  "[T]his is not a question . . . of a case where the hospital is diligently working on the claims and it's on the sixty-first day and they're still scrambling to go through their spreadsheets, you know, the government wouldn't be bringing that kind of a claim."  Tr. 22:8-12.  In that situation, the provider would not have acted with the reckless disregard, deliberate ignorance, or actual knowledge of an overpayment required to support an FCA claim.

Defendants' interpretation, meanwhile, would make it all but impossible to enforce the reverse false claims provision of the FCA in the arena of healthcare fraud.  In the Government's words, "Permitting a healthcare provider that requests and receives an analysis showing over 900 likely overpayments to escape FCA liability by simply ignoring the analysis altogether and putting its head in the sand would subvert Congress's intent in amending § 3729(a)(1)(G)."  Doc. 59 at 19 (citing *United States v. Lakeshore Med. Clinic, Ltd.*, No. 11 Civ. 00892, 2013 WL 1307013, at *4 (E.D. Wis. Mar. 28, 2013)).  Sure enough, the Government's Complaint in this action alleges that Defendants, upon receiving Kane's email and analysis, did nothing with the set of claims he pointed out as potentially overpaid and paid back hundreds of claims only after receiving the Government's CID.  Gov't Compl. ¶¶ 36, 38.  If Kane's email did *not* "identify"

overpayments within the meaning of the statute, there will be no recourse for the Government when providers behave as Continuum allegedly behaved here. It would be an absurd result to construe this robust anti-fraud scheme as permitting willful ignorance to delay the formation of an obligation to repay the government money that it is due.

In addition, to accept Defendants' conception of the statutory framework and their definition of "identify" would impose an unworkably stringent burden on plaintiffs at the pre-discovery stage. While the Government has access to information regarding the date of erroneously submitted claims, the date those claims were paid by Medicaid, and the date they were repaid tardily by Defendants, it does not have access at this point to information concerning the date that *Defendants* conclusively determined that each individual claim had actually, rather than possibly, been overpaid.[19] Under the Defendants' framework, their obligation to pay would not be triggered until *after* they have done the work necessary to determine conclusively the precise amount owed to the Government, thus creating a perverse incentive to delay learning the amount due and relegating the sixty-day period to merely the time within which they would have to cut the check. This is likely not what Congress intended. Therefore, while the Government's interpretation would impose a stringent—and, in certain cases, potentially unworkable—burden on providers, Defendants' interpretation would produce absurd results.

### iii.    Legislative Purpose

In the exercise of statutory interpretation, it is a reviewing court's obligation "to give effect to congressional purpose so long as the congressional language does not itself bar that result." *Johnson v. United States,* 529 U.S. 694, 710 n. 10 (2000). The absurdity of Defendants' proposed reading is all the more striking against the backdrop of Congress's purpose in passing

---

[19] Even in Defendants' papers in support of their motions to dismiss, they do not propose an alternative point in time as the date on which the overpayments were positively identified.

27

the FCA, amending it through the FERA, and incorporating, in the ACA, a mandate to report and return Medicaid overpayments.

"Debates at the time [of the FCA's original passage] suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Neifert-White Co.*, 390 U.S. at 232.  The 1986 amendments to the FCA—the first since its enactment more than a century earlier—"sought to loosen restrictive judicial interpretation of the Act's liability standard and the burden of proof by defining previously undefined terms, by expanding the *qui tam* jurisdictional provisions, and by increasing civil penalties." *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Acc. Ins. Co.*, 721 F. Supp. 1247, 1252 (S.D. Fla. 1989) (citing 132 Cong. Rec. H6479–82 (daily ed. Sept. 9, 1986) (statements of Reps. Glickman, Fish, and Rodino)).

In 2009, with the passage of the FERA, Congress again sought to reinforce the government's ability to combat fraud using the FCA.  The Senate Judiciary Committee Report on that bill referred to the FCA as "[o]ne of the most successful tools for combating waste and abuse in Government spending," and "an extraordinary civil enforcement tool."  S. Rep. 111-10, 10, 2009 U.S.C.C.A.N. 430, 437.  The report further noted that the FCA's effectiveness had "recently been undermined by court decisions limiting the scope of the law and allowing subcontractors and non-governmental entities to escape responsibility for proven frauds."  *Id.*  By introducing a definition for "obligation" and specifying that knowing retention of an overpayment carried FCA liability, the FERA aimed to "clarify and correct erroneous interpretations of the law" in judicial decisions that set inappropriately high burdens for the Government in enforcing the FCA.  *Id.* at 10, 438.  Each time Congress has weighed in on the

purpose and power of the FCA, it has endorsed a reading of that statute as a robust, remedial measure aimed at combatting fraud against the federal government as firmly as possible.

Against that backdrop, Congress expressly created FCA liability for the retention of Medicaid overpayments in the ACA.  By requiring providers to self-report overpayments and imposing a relatively short deadline for repayments, violation of which risks the severe liability of the FCA, Congress intentionally placed the onus on providers, rather than on the Government, to quickly address overpayments and return any wrongly collected money.  This reading is in line with the legislative purpose of the FCA, the 1986 FCA amendments, and the FERA, which together reflect Congress's more than 150-year commitment to deterring fraud against the federal government and ensuring that Government losses due to fraud are recouped in a timely fashion. Based on this understanding of legislative purpose, Defendants' proposed reading of the ACA would frustrate Congress's intention to subject willful ignorance of Medicaid overpayments to the FCA's stringent penalty scheme.

### iv.    Agency Deference

As a final note, the Court considers but does not place significant weight upon the interpretation provided by the Centers for Medicare and Medicaid Services (CMS), the executive agency within HHS responsible for administering the Medicare program and administering the Medicaid program in partnership with state governments.  42 U.S.C. §§ 1395, 1396.

In appropriate cases, where "canons of statutory interpretation and resort to other interpretive aids (like legislative history) do not resolve the issue," the Court may defer to the viewpoint of the executive agency tasked with administering the statute, "particularly insofar as those views are expressed in rules and regulations that implement the statute." *Natural Res. Def. Council, Inc.*, 268 F.3d at 98; *see also United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001)

("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . .") (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

On May 23, 2014, CMS issued a final rule implementing the ACA's report and return provisions with respect to the Part C Medicare Advantage program and the Part D Prescription Drug program.[20] *See* U.S. Dep't of Health & Human Servs., Ctrs. For Medicare & Medicaid Servs., *Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 79 Fed. Reg. 29,844 (May 23, 2014). In that final rule, CMS defined "identified overpayment" by stating that a Medicare Advantage organization or Part D sponsor "has identified an overpayment when the [entity] has determined, or should have determined through the exercise of reasonable diligence, that [it] has received an overpayment." 42 C.F.R. §§ 422.326(c), 423.360(c). In adopting the rule, CMS explained that "reasonable diligence might require an investigation conducted in good faith and in a timely manner by qualified individuals in response to credible information of a potential overpayment." 79 Fed. Reg. at 29,923-24. To those commenters who urged that "identify" be defined to require "actual knowledge," CMS responded by observing that such a rule would permit organizations to "easily avoid returning improperly received payments," thus defeating the purpose of that section of the ACA. *Id.* at 29,924.

While this rule does not technically apply in the context of Medicaid, its logic plainly does. Defendants overplay their hand by arguing that there is "no reason to assume that CMS's interpretation of the term 'identified' for the purpose of its rules relating to overpayments to

---

[20] Medicare Part D is a voluntary prescription drug benefit program for Medicare enrollees enacted in 2003 when Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act (""MMA"). Pub. L. No. 108-173, 117 Stat. 2066, *codified at* 42 U.S.C. § 1395-101 *et seq.*

[Medicare Advantage] organizations and Part D Plans, which is based solely on a policy judgment, is applicable to health care providers for whom different policy considerations may apply." Defs.' Reply Supp. Mot. to Dismiss Gov't Compl. at 6 (Doc. 61). To the contrary, the same policy considerations readily extend to the Medicaid context. Furthermore, it is hard to imagine how CMS could reasonably conclude that the word "identified" bears multiple meanings within a single provision, § 3729(a)(1)(G), without express direction from Congress.

In addition, CMS issued a proposed rule on February 16, 2012, which contemplated adopting for Medicare providers and suppliers the same definition of "identified" that was adopted for Medicare Parts C and D. Under that proposed rule, an overpayment is "identified" when a provider "has actual knowledge of the overpayment or acts in reckless disregard or deliberate ignorance of the overpayment." 77 Fed. Reg. 9179-9187 (Feb. 16, 2012). CMS expressed its belief that "Congress' use of the term 'knowing'" in the report and return provision's "Definitions" section "was intended to apply to determining when a provider or supplier has identified an overpayment." *Id.* CMS further explained that its definition would give "providers and suppliers an incentive to exercise reasonable diligence to determine whether an overpayment exists" and that, "[w]ithout such a definition, some providers and suppliers might avoid performing activities to determine whether an overpayment exists, such as self-audits, compliance checks, and other additional research." *Id.* Under this definition, where a provider receives information concerning a "potential overpayment," the provider would have "an obligation to make a reasonable inquiry to determine whether an overpayment exists." *Id.* at 9182. Failure to do so with "all deliberate speed . . . could result in the provider knowingly retaining an overpayment because it acted in reckless disregard or deliberate ignorance of whether or not it received such an overpayment." *Id.*

But this rule has only been proposed, not adopted,[21] and even if adopted would apply

only to Medicare—not Medicaid—providers and suppliers.  *See Sweet v. Sheahan*, 235 F.3d 80,

87 (2d Cir. 2000) (noting the "established point of law that proposed regulations . . . have no

legal effect"); *Id.* at 9181 (stating that the proposed rule applied only to Medicare Part A and Part

B providers and suppliers, and that "[o]ther stakeholders, including . . . Medicaid MCOs [would]

be addressed at a later date").  Consequently, while this proposal provides a useful interpretation

of the report and return provision, it has no legal effect and is entitled to no formal deference

from this Court.  At this juncture, the Court merely observes that its conclusion is at least

consistent with CMS's final rule for Medicare Advantage and Part D sponsors, as well as its

proposed rule for Medicare Part A and B providers and suppliers, both of which construe the

very provision at issue here.

> ### 2.      The Government Properly Alleges that Defendants Knowingly Concealed or Knowingly and Improperly Avoided or Decreased an Obligation

Defendants next argue that the Government's Complaint fails to allege that Defendants

knowingly "concealed" or knowingly and improperly "avoided" or "decreased" an obligation,

even if an obligation existed.  Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 14.  The

Court here focuses on Defendants' argument with regard to knowing and improper avoidance,

which the Government has beyond doubt pleaded with sufficient particularly.

---

[21] On February 17, 2015, CMS announced that it would delay for another year the adoption of any final rule concerning the 60-day clock, due to "exceptional circumstances" including more than 400 public comments, "internal stakeholder feedback," and continuing collaboration with the Department of Justice and the HHS Office of Inspector General.  77 F.R. 9179, *available at* https://federalregister.gov/a/2012-3642.  Pursuant to § 1871(a)(3)(A) of the Social Security Act, the Secretary of HHS is required, in consultation with the Director of the Office of Management and Budget (OMB), to establish "a regular timeline for the publication of a final rule based on the previous publication of a proposed rule or an interim final rule."  This timeline may vary depending on the complexity of the rule, the number and scope of comments received, and other factors, but may not exceed three years from the date of the proposed or interim final rule's publication, absent "exceptional circumstances."  *Id.* § 1871(a)(3)(B).

### i.     Avoidance

Defendants rely on Black's Law Dictionary, which does not define "avoid," but defines "avoidance" as including the "*act* of evading or escaping."  *Id.* at 15 (citing Black's Law Dictionary 156 (9th ed. 2009) (emphasis added)).  Defendants claim that avoidance cannot be pleaded with allegations of failure to act in a timely fashion and assert that the Government needed to plead that they took "active and conscious action" to establish avoidance.  *Id.* However, Defendants ignore numerous other definitions for "avoid," including "to refrain from." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/avoid (last visited July 28, 2015).  Similarly, the Collins Dictionary includes among other synonyms for "avoid":  "elude," "ignore," "keep away from," "keep aloof from," "shun," "steer clear of," and "sidestep."  Collins Dictionary, http://www.collinsdictionary.com/dictionary/english/avoid (last visited July 28, 2015).   The foregoing definitions support the conclusion that the plain meaning of "avoid" includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing.

Whether or not Defendants *actually* avoided repaying an obligation is a question that may be decided on facts that emerge during discovery or trial.  At a later stage in these proceedings, Defendants may introduce evidence to suggest that they took steps to investigate or address the problem brought to their attention by the Comptroller and Kane.  For the purposes of Defendants' motion to dismiss, however, the Court concludes that the Government has adequately pleaded that Defendants avoided returning the overpayments.  The Complaint alleges that the Healthfirst software glitch was brought to Defendants' attention by at least December 2010.  Gov't Compl. ¶ 33.  Defendants tasked Kane with investigating the scope of the issue, but when he presented them with a list of potentially affected claims, he was fired, and the

Government alleges that Defendants did nothing further with his analysis.  Although they repaid certain claims that were specifically brought to their attention by the Comptroller, they neglected to repay more than three hundred claims until they received the Government's CID in June 2012.

On arguably less compelling facts, in another Medicaid case, a district court in the Eastern District of Wisconsin found that a relator had stated a claim under § 3729(a)(1)(G) where the defendant had conducted an audit, found high rates of improper "upcoding" by physicians, and failed to follow up on non-audited claims submitted by those physicians.  *See Lakeshore*, 2013 WL 1307013, at *3.  The *Lakeshore* Court held, "Although [relator] does not allege that defendant knew that specific requests for reimbursement for [the] services were false, she claims that defendant ignored audits disclosing a high rate of upcoding and ultimately eliminated audits altogether."  *Id.*  Therefore, the Court determined that the relator had stated a plausible claim for relief under the FCA reverse false claims provision, noting that "[i]f the government overpaid . . . and defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government."  *Id.* at *4.

Most importantly, the FCA as amended by the FERA unequivocally provides that to retain—to not return—an overpayment constitutes a violation of the FCA.  The ACA designates a sixty-day timeline after which retention of a Medicaid overpayment constitutes an obligation.  Defendants' argument that "failure to act quickly enough" cannot constitute "avoidance" is plainly at odds with the language and intentions of the FCA, the FERA, and ACA.[22]

---

[22] Having found that the Complaint adequately alleges avoidance, the Court need not address whether it pleads that Defendants concealed or decreased an obligation.

###                    ii.        Knowledge

Even if it is possible to avoid an obligation by failing to act quickly enough, Defendants

maintain, the Complaint fails because it does not sufficiently allege that Defendants' failure to

act was "knowing."  Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 16.  This

argument fails for two primary reasons.

First, to satisfy Rule 9(b), conditions of a person's mind, including knowledge, may be

alleged generally rather than with particularity.  *See Kalnit*, 264 F.3d at 138 (citing Fed. R. Civ.

P. 9(b)).  Second, the FCA's knowledge standard plainly encapsulates recklessness and

deliberate ignorance.  *See U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.*, No. 12 Civ. 08193

(PCT) (PGR), 2015 WL 1522174, at *3 (D. Ariz. Apr. 2, 2015) (noting that while "innocent

mistakes, mere negligent representations and differences in interpretations are not false

certifications under the" FCA, the "'knowing' scienter needed for a violation of the FCA may be

established not only though a showing of actual knowledge of the falsity of a claim, but also

through a showing of deliberate indifference or reckless disregard of whether the claim is false")

(citations omitted); *see also U.S. ex rel. Drakeford v. Tuomey*, No. 13-2219, 2015 WL 4036166,

at *11 (4th Cir. July 2, 2015) ("The purpose of the FCA's scienter requirement is to avoid

punishing 'honest mistakes or incorrect claims submitted through mere negligence.'") (quoting

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.,* 612 F.3d 724, 728

(4th Cir. 2010)).  Here, the Government has pleaded facts that are consistent with recklessness or

deliberate ignorance, not merely negligence.

Defendants argue that their "alleged failure to respond quickly enough after Kane's report

identified potential overpayments is hardly indicative of a *knowing* effort to conceal, avoid or

decrease an obligation," because "it is just as likely that Defendants accepted Kane's

characterization of the report as preliminary and incomplete, and were waiting for the new report that he indicated was required."  Defs.' Mem. Law. Supp. Mot. to Dismiss Gov't Compl. at 16. But Defendants fired Kane four days after receiving his report and provide nothing to suggest that they tasked anyone else with investigating the claims he pointed out as potential overpayments.  They also never brought his analysis to the attention of the Comptroller.  The Court finds implausible Defendants' suggestion that they delayed their statutorily-required duty because they were waiting for a report from their terminated employee.

Based on the facts in the Complaint, the Government has complied with the FCA's knowledge requirement and Rule 9(b).  *See Drakeford*, 2015 WL 4036166, at *11 (finding "ample support" for a jury verdict as to a defendant's intent under the FCA knowledge standard, because "a reasonable jury" could have found that he "possessed the requisite scienter once it determined to disregard" warnings and "could . . .  be troubled by [his] seeming inaction in the face of [those] warnings"); *cf. United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("[A] failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield False Claims Act liability."[23]

### 3.      The Government Properly Alleges that Defendants Had an Obligation With Regard to the Federal Government

In a final attempt to defeat the Government's Complaint, Defendants contend that the Government cannot state a claim under § 3729(a)(1)(G) without having alleged an obligation to pay or transmit money or property to the *federal* government.  To the extent that any

---

[23] The Court declines to address Defendants' argument that the United States has failed to plead their "improper" avoidance of an obligation.  That argument hinges on an interpretation of the ACA's report and return provision that the Court has already rejected.

"obligation" did arise in this case, they claim, it was owed not to the federal government but to the New York State Medicaid program.  That is incorrect.

First, the Medicaid program is funded jointly by the federal and state governments.  *See Lakeshore*, 2013 WL 1307013, at *1 (finding that the FCA was implicated in a case involving Medicaid fraud because of this joint funding scheme).  Second, Congress has repeatedly and specifically provided that claims submitted to Medicaid constitute false claims for the purposes of the FCA.  When Congress enacted the 1986 FCA Amendments, the Senate Judiciary Committee Report provided that "[a]lthough the Federal involvement in the Medicaid program is less direct, claims submitted to State agencies under this program have also been held to be claims to the United States under the False Claims Act."  S. Rep. 99-345, 22, 1986 U.S.C.C.A.N. 5266, 5287.  Similarly, the Senate Judiciary Committee Report accompanying the FERA clearly explained that the bill clarified that "the FCA reaches all false claims submitted to State administered Medicaid programs."  S. Rep. No. 111-10, at 11, reprinted at 2009 U.S.C.C.A.N. 438.  Finally, in the ACA, Congress stated that funds received or retained under Medicaid would constitute overpayments for the purposes of 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C. § 1320a-7k(d)(4)(B).  The structure of the Medicaid program and several express statements of Congress flatly contradict Defendants' argument that the Government has failed to allege an obligation with regard to the federal government.

For all of the above reasons, Defendants' motion to dismiss the Complaint of Plaintiff-Intervenor the United States is denied.

### B.     New York's Complaint

New York's Complaint-in-Intervention is identical to that of the United States in all respects, except that it alleges a violation of the NYFCA rather than the FCA.  Defendants argue

that New York's Complaint must be dismissed for two reasons.  First, they contend that New York fails to allege that Defendants knowingly concealed or knowingly and improperly avoided an obligation.  Defs.' Mem. Law. Supp. Mot. to Dismiss New York (Doc. 53) at 2-3.  This argument rests on the same reasoning as Defendants' argument in support of their motion to dismiss the United States' Complaint and, accordingly, fails.  *Id.*  Second, Defendants claim that New York's Complaint fails because State Finance Law § 189(1)(h) cannot be applied retroactively.  As noted above, that reverse false claims provision of the NYFCA was not included in the statute as initially enacted in 2007, State Fin. Law § 189 (2007), and was added only in March 2013.  *See* 2013 N.Y. Sess. Laws, Ch. 56, S. 2606, § 8 (Mar. 28, 2013).

The Supreme Court has observed an "apparent tension" between two canons of statutory construction:  first, the rule that a court should "apply the law in effect at the time it renders its decision," *Landgraf v. USI Film Products*, 511 U.S. 244, 264 (1994) (citations omitted), and second, "the axiom that retroactivity is not favored in the law, and its interpretive corollary that congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Id.* (internal quotation marks and citations omitted).  When these principles conflict, "where the congressional intent is clear, it governs."  *Id.*  Therefore, "the first step in determining whether a statute has an impermissible retroactive effect is to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively."  *I.N.S. v. St. Cyr*, 533 U.S. 289, 316 (2001) (citing *Martin v. Hadix*, 527 U.S. 343, 352 (1999)).

In this case, the intent of the New York legislature is clear that the law should be applied retroactively.  In the 2013 amendments to the State FCA that codified the "reverse false claims" scheme set forth by the FCA and FERA, the New York State Legislature provided:  "[T]he

38

provisions of this act shall apply to any pending cause of action brought pursuant to article 13 of the state finance law, and shall further apply to claims, records, statements or obligations, as defined by section 188 of the state finance law, that were made, used or existing prior to, on or after April 1, 2007." 2013 N.Y. Sess. Laws, Ch. 56, § 83(10). The Legislature included similar language when it first enacted the NYFCA in 2007, *see* 2007 Sess. Laws Ch. 58, §§ 39, 93(5), and when it amended the NYFCA in 2010. *See* 2010 Sess. Laws Ch. 379, § 13.

Based on the express directives on retroactivity in the 2007 NYFCA and 2010 amendments, courts in the Southern District and New York have concluded that both the original act and amended act were intended by the State Legislature to have retroactive effect. *See Bilotta*, 50 F. Supp. 3d at 540 ("Such language expressly provides for retroactive application of the Act.") (citing *Kuhali v. Reno*, 266 F.3d 93, 110-11 (2d Cir. 2001)); *United States v. Huron Consulting Grp., Inc.*, No. 09 Civ. 1800 (JSR), 2010 WL 3467054, at *3 (S.D.N.Y. Aug. 25, 2010) (concluding that the NYFCA, enacted in 2007, applied retroactively to claims filed prior to that date); *United States v. NYSARC,* No. 03 Civ. 7250 (SHS) (S.D.N.Y. Mar. 20, 2009) (Tr. 16–17) (holding that the NYFCA is explicitly retroactive, even if its "provision concerning retroactivity is not officially codified in the New York State Finance Law"); *People v. Sprint Nextel Corp.*, 114 A.D.3d 622, 622, 980, N.Y.S.2d 769 (1st Dep't 2014) (concluding that the 2010 NYFCA amendments were intended to carry retroactive effect); *New York ex rel. Colucci v. Beth Israel Med. Ctr.,* Index No. 112059/07 (N.Y. Sup. Ct. N.Y. Cty. July 23, 2009) (Tr. 44–45) (noting a "specific very clear statement of intention that" the NYFCA should have retroactive effect).[24] This Court agrees.

---

[24] Like the court in *United States ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, this Court finds Defendants' reliance on *U.S. ex rel. Romano v. New York-Presbyterian Hosp.*, No. 00 Civ. 8792 (LLS), 2008 WL 612691, at *2 (S.D.N.Y. Mar. 5, 2008), unavailing. *See Bilotta*, 50 F. Supp. 3d at 541. *Romano* did not turn on its finding that the NYFCA did not carry retroactive application; the Court's statement on that point was dicta. *Id.* at 541 n. 15.

Nor would retroactive application violate the *Ex Post Facto* Clause, which prohibits enforcement of a law that punishes acts that were innocent prior to the law's enactment. *Bilotta*, 50 F. Supp. 3d at 540 (quoting *Hobbs v. County of Westchester,* 397 F.3d 133, 157 (2d Cir. 2005)). The Clause only applies to criminal punishments and to civil disabilities that "disguise criminal penalties." *Id.* (quoting *U.S. ex rel. Drake v. NSI, Inc.,* 736 F. Supp. 2d 489, 498 (D. Conn. 2010)). After determining whether a law was intended to carry retrospective effect and applies to applies to pre-enactment conduct, a court must assess whether the law "disadvantages affected parties." *Id.* (citing *United States v. Kilkenny,* 493 F.3d 122, 127 (2d Cir.2007)). In the context of civil matters, the court must then:

> ascertain whether the legislature meant the statute to establish "civil" proceedings. If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it "civil." Because [courts] ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.

*Id.* (quoting *Drake*, 736 F. Supp. 2d at 498).

Defendants would be disadvantaged by retroactive application of the NYFCA, because such application would expose them to liability for their conduct prior to the 2013 amendments. *See id.* at 540. The Court must therefore consider whether the State legislature intended the NYFCA, as amended, to establish "civil" proceedings and, if so, whether it is "so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.'" *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)).

Based on the plain text of the NYFCA, the State legislature clearly intended to create a civil penalty scheme. The Act's reverse false claims provision states than a person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

40

transmit money or property to the state or a local government, or conspires to do the same; shall

be liable to the state . . . for a *civil penalty* of not less than six thousand dollars and not more than

twelve thousand dollars" plus treble damages.  State Fin. Law § 189(1)(h).  The Court agrees

with the several other courts to have considered this issue that "[t]he express language used

indicates the Legislature's preference for a civil label."  *See People ex rel. Schneiderman v.*

*Sprint Nextel Corp.*, 41 Misc. 3d 511, 521, 970 N.Y.S.2d 164, 174 (N.Y. Sup. Ct. 2013) *aff'd sub*

*nom. People v. Sprint Nextel Corp.*, 114 A.D.3d 622, 980 N.Y.S.2d 769 (2014); *see also Bilotta*,

50 F. Supp. 3d at 542.

Moreover, the Act is not so punitive in effect as to negate the legislature's intention to

create a civil penalty scheme.[25]  To assess the punitiveness of the NYFCA, the Court looks to

seven factors highlighted by the Supreme Court to "determine whether an Act . . . is penal or

regulatory in character."  *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).  These

include:  (1) "[w]hether the sanction involves an affirmative disability or restraint," (2) "whether

it has historically been regarded as a punishment," (3) "whether it comes into play only on a

finding of scienter," (4) "whether its operation will promote the traditional aims of punishment—

retribution and deterrence," (5) "whether the behavior to which it applies is already a crime,"

---

[25] Defendants cite a New York Court of Appeals decision, *State ex rel. Grupp v. DHL Express (USA), Inc.*, for the proposition that the NYFCA's "imposition of civil penalties and treble damages evinces a broader punitive goal of deterring fraudulent conduct against the State" rather than merely compensating the State for damages suffered due to violations of the statute.  19 N.Y.3d 278, 286-87 (2012).  But that case did not involve an *Ex Post Facto* challenge.  Rather, in *Grupp*, the court considered whether NYFCA claims were preempted by the federal Airline Deregulation Act of 1978 and the Federal Aviation Administration Authorization Act.  *See id.* at 281, 947 N.Y.S.2d 368, 970 N.E.2d 391.  In resolving that question, the court considered the applicability of the "market participant doctrine exception" to federal preemption, which does not apply "when government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power."  *Bilotta*, 50 F. Supp. 3d at 542-43 (citing *Grupp* 19 N.Y.3d at 286-87).  The Court of Appeals determined that the New York State legislature was seeking to advance "general societal goals" when it enacted the State FCA, rather than simply "compensating the State for damages caused by . . . purported fraudulent scheme[s] and addressing its narrow proprietary interests."  *Id.* (quoting 19 N.Y.3d at 286-87).  The court did not consider whether the NYFCA's regime of civil penalties is "so punitive" that it violates the *Ex Post Facto* Clause.  Therefore, *Grupp* is not dispositive.  *See Bilotta*, 50 F. Supp. 3d at 543; *see also Schneiderman,* 41 Misc.3d at 522, 970 N.Y.S.2d 164.

(6) "whether an alternative purpose to which it may rationally be connected is assignable for it," and (7) "whether it appears excessive in relation to the alternative purpose assigned." *Id.* at 168-69.  In conducting this analysis, the Court looks to the few opinions contemplating the retroactivity of the NYFCA as well as the many federal cases contemplating the retroactivity of the federal FCA, which New York courts rely on when interpreting the state corollary.  *Bilotta*, 50 F. Supp. 3d at 543 (quoting *New York Soc.*, 2014 WL 3905742, at *11) (collecting cases).

First, the NYFCA's penalty scheme does not impose an affirmative disability or restraint. *See id.* at 544 (collecting cases); *Schneiderman*, 41 Misc. 3d at 521, 970 N.Y.S.2d 164 ("[The NYFCA] imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint.").  Second, monetary penalties like those imposed by the NYFCA have not "historically been viewed as punishment." *Bilotta*, 50 F. Supp. 3d at 544 (quoting S.*E.C. v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)); *Schneiderman*, 41 Misc.3d at 521-22, 970 N.Y.S.2d 164; *U.S. ex rel. Bergman v. Abbot Labs.*, 995 F. Supp. 2d 357, 385 (E.D. Pa. 2014) (concluding that the penalties and damages imposed by the Wisconsin and Tennessee FCAs were not historically punitive).  Third, courts have held that the NYFCA does not depend on a finding of scienter, because it can be violated "upon either a finding of *scienter* . . . or recklessness." *Bilotta*, 50 F. Supp.3d at 545 (quoting *Sanders v. Allison Engine Co.*, 703 F.3d 930, 946 (6th Cir. 2012)); *Bergman*, 995 F. Supp. 2d at 385.

The fourth factor raises greater complexity.  As the New York Court of Appeals has concluded, the NYFCA's penalty and damage scheme does appear, at least in part, to serve the aims of punishment, retribution, and deterrence.  *Grupp*, 19 N.Y.3d at 286-87, 947 N.Y.S.2d 368, 970 N.E.2d 391.  However, numerous courts have determined that the NYFCA's and FCA's provision of treble damages carries a compensatory, remedial purpose alongside its punitive and

42

deterrent goals.  *See Bilotta*, 50 F. Supp. 3d at 545-46 (collecting cases).  As a result, the admittedly severe penalty and damages scheme of the NYFCA "does not compel a conclusion that the statute is penal.  *Id.*  The fifth factor weighs easily against Defendants' argument, as the reverse false claims provision of the NYFCA does not regulate conduct that was already a crime. Sixth, the NYFCA's penalty scheme may be rationally connected to the non-punitive purposes of "compensating the 'private relator who began the action' while still allowing the Government to be made whole, and 'quicken[ing] the self-interest of some private plaintiff who can spot violations and start litigating.'"  *Id.* at 547 (quoting *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 120 (2003)).  The seventh factor, whether these penalties and damages appear "excessive in relation to the alternative purpose assigned," *Mendoza-Martinez*, 372 U.S. at 169, may "not yield a clear answer," *id.*, but the same compensatory, non-punitive aims identified under the sixth factor suggest that the penalties are not unduly excessive.

Of the seven *Mendoza-Martinez* factors, five support a finding that the NYFCA is not so punitive as to override the New York State legislature's explicit intention to create a civil rather than criminal scheme.  Yet "only the 'clearest proof will suffice'" to "transform what has been denominated a civil remedy into a criminal penalty."  *Smith,* 538 U.S. at 92.  Here, the scant paragraph Defendants provide in support of their argument that the NYFCA is punitive does not constitute the "clearest proof," proof capable of morphing civil penalties into punitive sanctions. *See Bilotta*, 50 F. Supp. 3d at 547 (citations omitted).  Therefore, the Court concludes that retroactive application of the NYFCA does not violate the *Ex Post Facto* Clause.

Accordingly, Defendants' motion to dismiss New York's claims is denied, even though those claims pre-date the 2013 NYFCA amendments.

**IV.**  **CONCLUSION**

For the reasons set forth above, Defendants' motions to dismiss the United States' and New York's Complaints-in-Intervention (Docs. 20, 21) are DENIED.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 52, 54).  The parties are directed to appear for an initial pretrial conference on August 18, 2015 at 11:00 a.m.

It is SO ORDERED.

Dated:     August 3, 2015
           New York, New York

Edgardo Ramos, U.S.D.J.

44